Roberts v. Roberts.

No. 21,436.

C. M. ROBERTS, *Appellee*, v. MAGGIE L. ROBERTS, *Appellant*.

SYLLABUS BY THE COURT.

1. ACTION FOR DIVORCE—*Parties in Equal Wrong—Judicial Discretion.* When the parties to an action for divorce appear to be in equal wrong the court has discretion either to grant or refuse a divorce. *Burke v. Burke*, 44 Kan. 307, 24 Pac. 466, in so far as contrary hereto, is overruled.

2. SAME—*When Parties are in Equal Wrong.* Such parties are in equal wrong when the conduct of one has established any one or more of the statutory grounds for divorce, and the conduct of the other has also established any one or more of such grounds.

3. SAME—*Statutory Ground for Divorce Established—Judicial Discretion—Divorce Granted.* When in such action it is found that the defendant's conduct has established one or more statutory grounds for divorce, it is not error or abuse of discretion of which such party may complain to grant a decree to the other party who under the evidence might be, but is not found to be, in equal wrong.

4. SAME—*Conflicting Evidence.* The evidence examined, and it is held that the usual rule that verdicts or findings based on conflicting evidence will not be disturbed sufficiently applies to preclude overturning the result reached by the trial court.

Appeal from Ford district court; LITTLETON M. DAY, judge. Opinion filed May 11, 1918. Affirmed.

*J. S. Dean, M. O. Lock, Hugh T. Fisher*, and *E. B. Smith*, all of Topeka, for the appellant.

*L. A. Madison*, and *Carl Van Riper*, both of Dodge City, for the appellee.

5—Kan.—3099

The opinion of the court was delivered by

WEST, J.: The defendant appeals from a decree of divorce granted to the plaintiff. The amended petition alleged that the parties were married in Missouri in 1871; that about four years before this suit was begun the defendant willfully abandoned him and had ever since remained away and lived apart from him and had refused to maintain the relation of a wife to him, thereby constituting abandonment and gross neglect of duty; that for a long time prior to such abandonment she was almost constantly complaining, scolding, and abusing plaintiff over trifling and insignificant matters, to such an extent that it became almost impossible for him to live with her; that at various times in the presence of divers persons she assailed his character, accused him of murder and adultery, and at one time assaulted and beat him; and that for the purpose of harassing and injuring him and interfering with his business she informed the plaintiff that he would never so long as he lived be able to sell and dispose of any of his real estate, and she refused to join with him in deeds of conveyance for lots which he had opportunities to sell at attractive prices, in order to torment, injure, and harass him. It was further alleged that after the abandonment by the defendant the parties entered into a contract in writing providing for a complete settlement of all their property rights, which had since been carried out by an actual division of the property.

After a general denial, the defendant pleaded that the only trouble between the parties had arisen because of the plaintiff's misconduct; that in the year 1883 he became infatuated with one Lizzie Doab, buying and furnishing a house for her, supporting her for a long time, afterwards bringing her to Kansas with him and living with her here; that thereafter the relationship between him and this woman ceased, and the defendant forgave the plaintiff for his past offenses and continued to live in peace and harmony with him for many years, during which they, by their joint efforts, accumulated a large amount of property; that during the year 1911 they moved to Dodge City for the purpose of making their home there during the last years of their lives, but that upon their arrival the plaintiff became infatuated with one Velma Warder in such open and

Roberts v. Roberts.

notorious manner as to cause public scandal and criticism; that he was also unduly attentive to Velma Warder's sister, one Etta Conrad, and finally abandoned and deserted the defendant in the fall of 1911, first living with the Conrad woman and her husband, and visiting with increasing frequency Velma Warder, and afterward taking up a residence of his own and employing Velma Warder therein; and that during the summer of 1915 he took a trip to California with Velma Warder and another sister, his conduct with these women constituting a public scandal. She further alleged:

"That the cause of the separation between herself and plaintiff is due solely to the infatuation of the plaintiff for said Velma Warder and is caused not by any fault on the part of the defendant, but by the misconduct of the said plaintiff."

There is no direct charge of adultery with any of these latter named women.

The court made findings of fact, and, after reciting the adultery with Lizzie Doab in 1885 and 1886, found that about the year 1886, after the defendant came to Kansas, knowing of the former relation with the Doab woman, the parties were reconciled and lived together for more than twenty years; and that about the year 1911 the defendant refused to live with the plaintiff any longer, alleging as her reason therefor that he had become infatuated with a Mrs. Conrad and her sister Velma Warder.

"7. The defendant for some time prior to her refusal to reside longer with the plaintiff in 1911, had been complaining and found fault with the plaintiff and refused to permit him to handle his property, particularly real estate, to which she refused to join in the execution of deeds, thereby hindering him in business transactions.

"8. The defendant accused the plaintiff of infidelity, and according to the testimony of the plaintiff, which was corroborated by the witness, W. H. Eagle, the defendant was frequently compelled to leave the table at meal time, to get away from the defendant's fault findings and accusations.

"9. Upon one occasion in the year 1911, the plaintiff and defendant had a difficulty ending in a fight, as a result of which the plaintiff was charged with assault and battery upon the defendant, but the jury, after hearing the evidence in the case, found that the plaintiff was not guilty of any offense, and he was acquitted.

"10. Ever since the year 1911, when defendant refused to reside longer with plaintiff, they have lived apart, and there seems to be no

hope of their reconciliation. The apparent ill feeling between the parties has grown more pronounced, and the ends of matrimony have been utterly defeated.

"11. About the time of the separation in 1911, the parties made a property settlement, which has since that been put into execution; the court finds that the same was a just and equitable settlement, ample provision having been made by plaintiff for the defendant, and that the same should be ratified.

"12. There is no sufficient evidence to prove the plaintiff guilty of adultery in recent years, and while he may have been indiscreet in his conduct to some extent, there is no evidence to warrant the court in finding that in recent years the plaintiff has been guilty of adultery or of any conduct which would be sufficient to revive the old offense of adultery which had been condoned for more than twenty years before the separation of plaintiff and defendant."

Without going into details, it may be said that had the trial court, with the advantages of hearing and seeing the witnesses, found that the plaintiff, instead of being merely indiscreet, had relapsed into a continuous and persistent adulterer, the abstracts contain evidence to support such finding; but, of course, there were the usual denials, and in one instance the apparent impeachment of a witness who saw through a window which did not exist, all of which the trial court doubtless duly weighed and considered.

It has been held that—

"The proof to establish the adultery must be clear, positive and satisfactory. . . . the circumstances must lead to it, not only by fair inference but as a necessary conclusion; appearances equally capable of two interpretations, one an innocent one, will not justify the presumption of guilt." (Burke v. Burke, 44 Kan. 307, syl. ¶ 3, 24 Pac. 466.)

The defendant complains of the decree of divorce, being entirely satisfied with the property settlement, urging that the testimony shows the plaintiff to be the offender rather than herself, that the court below failed to apply the law of condonation and recrimination, that there was no testimony justifying a finding that the plaintiff was without fault, and,

"Fourth. The testimony utterly fails to determine that Mrs. Roberts committed any offense against the marital relations, and we therefore respectfully ask that this court direct that a new trial be had in this case."

The plaintiff testified, among other things, that he was 66 years old in 1917, and that for two years prior to the division of the property he and his wife had not lived together.

He fixed up the house to suit his wife, fixing up four or five rooms just the way she wanted them, and undertook to occupy a bedroom he had prepared for himself, but that when she would go away she would lock the outside doors so that he could not get into his room, and he had to break in with a crowbar; that she told him he had no business there, that it was her property; that the other old house was good enough for him, and so he took her at her word and went over there. He testified that she refused to sign deeds to his property; and that he owned 1,960 acres of wheat land and 8 or 10 pieces of property in town.

"Q. What other troubles did you have? A. Oh, my goodness alive. I could not tell you. I would not attempt to tell you. We had plenty.

"Q. I want you to tell the court something of the nature of them and what they were? A. Well, I happen to think of just one thing right now. I go to see my old mother once a year and have been now for ten years. I have rheumatism pretty bad at times, and I tried to put my collar on at one time before the mirror to dress to go to see my old mother and she walked backwards and forth and jawed me and abused my old mother just to aggravate me. I know she had nothing against my old mother.

"Q. What did she say about your mother? A. She called her an old wretch and an old bitch and said she ought to go to hell. I asked what for. Said for raising such a son-of-a-bitch of a son as you are. Then she quit by saying she hoped the train would wreck and send my soul into hell before I ever reached there. That is just what she said to me and I never will forget it."

He further testified that she accused him of having been a murderer, and took pains to circulate the report; that she struck him several times with her hand opened and slapped him on the sides of his head, but that he did not touch her; that at the time of the fight mentioned in the findings she and her daughter beat him up and tried to kill him; that he did one time, before he came to Kansas, shoot a man in self-defense, a crowd having begun shooting at him, but he was never even indicted.

W. H. Eagle, a contractor who built several houses for the plaintiff, including the new house from which the latter moved at the time of the separation, testified that Mr. Roberts was building a new house and that Mrs. Roberts had agreed as a consideration therefor, although no separation had been had

at that time, that he would be allowed to trade any real estate, and that she would sign a deed whenever he asked her to.

"Q. How many times would you say during the time you were there that he left the table to get away from her abuse? A. Well, to try to make an average of it as well as my recollection goes I would say about one-half of the times when he was reproached.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. I will ask you if Mrs. Roberts at any time ever said anything to you about Mr. Roberts having killed some man in Missouri? A. Yes, sir.

"Q. When and where did she say anything to you about that? A. At the house where I was eating my meals.

"Q. What did she say to you about that matter? A. Well, I cannot quote her words exactly, because she used a good many of them, and left the impression on my mind that she thought she had a lead-pipe cinch and could lead the old man by the nose anywhere she wanted.

"Q. What did she say about the matter of having killed a man or men in Missouri? A. She said that he had killed a man in Missouri and that she had him practically under her thumb."

He further testified that in prior years she had held up real-estate deals by refusing to sign deeds, and afterwards she violated her agreement to do so; that he never could recall a single meal eaten at the house when Mrs. Roberts did not find fault with Mr. Roberts about something; that the plaintiff did not even talk back to her, and that all he did was beg her to let him be in peace.

While the defendant testified that she thought it wicked to get a divorce, and that for two hundred years there had not been a divorce among the women of her family, her husband swore that she frequently threatened him with this very evil.

We are asked to hold, not only that the court might in its discretion have denied the plaintiff a divorce, but also that it was its duty so to do, on the ground that his conduct destroyed the effect of the condonation of his former offense and put him in a situation entirely inconsistent with the claims of equity.

In *Day v. Day*, 71 Kan. 385, 80 Pac. 974, the chief justice speaking for the court said:

"It will be observed that the refusal of a divorce, when both parties are guilty of violating the marriage contract, is left to the discretion of the trial court."   (p. 388.)

"Ten grounds for divorce are prescribed by the statute; and abandonment, when established, is just as effectual to dissolve the marriage relation as is the graver offense of adultery.   Since the legislature has

treated each ground as the equal of any other, and visited upon each offense the same legal consequences, the court cannot well distinguish between them because one offense may appear to us to involve more of turpitude or disgrace than another." (p. 389.)

After discussing the doctrine of recrimination, it was said:

"We cannot say that there was not such equality of wrong as the statute contemplates. The question was settled by the legislature, and the court in its discretion could, as it did, hold that the plaintiff, who had been guilty of extreme cruelty and gross neglect of duty, was in equal wrong with the defendant, who was guilty of adultery." (p. 390.)

In *Bovaird v. Bovaird,* 78 Kan. 315, 96 Pac. 666, the same writer said:

"The statute vests the court with discretion to refuse a divorce where the plaintiff, as well as the defendant, is in the wrong." (p. 317.)

Section 668 of the code of civil procedure provides that—

"When the parties appear to be in equal wrong, the court may in its discretion refuse to grant a divorce."

In *Spitsnaugle v. Spitsnaugle,* 87 Kan. 408, 124 Pac. 162, it was held that—

"When a statutory ground for divorce has been established, as in this case, the court has no discretion to refuse a decree unless the parties appear to be in equal wrong." (p. 410.)

It is argued, and authorities are cited, to the effect that condonation of the former misconduct of the husband must be deemed to have been on the continuing condition that he not only refrain from similar misconduct but also from other violations of the marriage obligation, or that his treatment must be marked by what is sometimes called conjugal kindness, and that upon his subsequent ill treatment of the wife, though not amounting of itself to a full ground for divorce, she might deem the original offense revived and dissolve the marriage relation.

Assuming, without deciding, that this position is correct, the further essential condition—the observance of the marriage obligations by the wife, necessarily implied—must also exist in order for her to take advantage of the husband's derelictions. So in one sense or another it all comes back to the question of the rights of the parties in view of the situation presented by the evidence of their own behavior.

Even if the parties had been found to be in equal wrong, the

court might have decreed a divorce, for discretion to refuse implies discretion to grant. True, in *Burke v. Burke*, 44 Kan. 307, 24 Pac. 466, it was held that a husband guilty of adultery could not obtain a divorce from a wife guilty of the same offense, and in the Day and Bovaird cases it was said that divorce is a remedy for the innocent and injured. But the legislature has vested in the district court discretion to refuse a divorce when it appears that the parties are in equal wrong. Were it the imperative duty thus to deny, there could be no discretion. The converse and necessary concomitant of discretion to refuse is discretion to grant. This statute is not mentioned in the Burke decision, and in so far as its effect is to mitigate or weaken the discretionary power expressly and impliedly vested by section 668 of the civil code that opinion is overruled.

"The action of the court in denying relief *ex mero motu* is, in the absence of a statutory requirement, a matter of discretion, but in the same instances the statutes provide that where it appears that the plaintiff has been guilty of adultery a divorce shall not be decreed, thereby making it an imperative duty of the court to do that which it had ample power in its discretion to do." (9. R. C. L. 392, § 185.)

The ecclesiastical law of England was not adopted as a part of our common law, and the jurisdiction over divorce is derived from statutory or constitutional provisions. Courts of equity have no inherent jurisdiction in the matter. (9 R. C. L. 396, § 190.) By so much the more, therefore, must full force and effect be given to the power conferred by section 668 of the civil code. In discussing the peremptory and discretionary provisions of the English act establishing the divorce court, Bishop says:

"If the complaining party has been guilty of adultery, even though committed after suit brought, or after a decree *nisi* dissolving the marriage, but before it is made absolute, the court will not, in general, grant the divorce. Yet where there is some special fact, taking the particular case out of the reason of the general rule, and sufficiently calling for clemency, it will act notwithstanding the recriminatory plea." (2 Bishop on Marriage and Divorce, 6th ed., § 82.)

As a general rule, one guilty of adultery has no standing in court to demand a divorce from the spouse who is also guilty of this or some other marital offense amounting to a ground for divorce, and generally the courts do not and will not decree a

divorce under such circumstances.   But when discretion is expressly given the court, when the parties appear to be in equal wrong, to deny a divorce, such discretion necessarily implies and imports discretion to grant, and only for abuse of such discretion can the complaining party be heard.

Hence, had the trial court been convinced of the plaintiff's recent adultery, the power to decree the plaintiff a divorce on account of the defendant's misconduct would have still existed. Not having been so convinced, and having expressly found that the proof was insufficient to break down the condonement of the former adultery, there can be no question of the jurisdiction to decree a divorce to the plaintiff.

The case was taken under advisement from November 28, 1916, to February 8, 1917.   The motion for a new trial filed February 9 was denied April 9, thus indicating that the trial court was still satisfied with the determination reached.

The usual rule, that verdicts or findings based on conflicting evidence will not be disturbed, sufficiently applies to preclude overturning the result reached in this case.

The decree is affirmed.

JOHNSTON, C. J., dissents.