## O'CONNOR *v.* O'CONNOR.

[Nos. 20603, 1269S83. Filed November 13, 1968. Rehearing denied December 11, 1968. Transfer granted December 10, 1969. Rehearing denied January 27, 1970.]

*Richard W. Adney,* of Lebanon, and *Paul T. Rochford,* of Indianapolis, for appellant.

*John L. Fox,* of Indianapolis, for appellee, *John M. Kitchen,* President, Indianapolis Bar Association, and *Charles W. Ardery, Jr.,* of Indianapolis, for Amicus Curiae, the Indianapolis Bar Association.

HUNTER, J.—This case involves an action for divorce brought by appellee against appellant in the Superior Court

of Marion County, Room No. 3, which upon a change of venue was tried in Boone County, Indiana. Appellant cross-complained and upon trial of the issues, appellee was awarded the divorce.

Appellant appealed the trial court decision to the Appellate Court which reversed and ordered a new trial. Following a denial of rehearing in that court, appellee petitioned this court for transfer. (For Appellate Court opinion see 143 Ind. App. 517, 241 N. E. 2d 387.) We have accepted.

In her petition for rehearing, appellee alleges three grounds for transfer. The first such ground is that the decision of the Appellate Court contravenes a ruling precedent of this court, namely *Sidebottom* v. *Sidebottom* (1968), 249 Ind. 572, 233 N. E. 2d 667, where we held that a spouse accepting the benefits of a divorce decree is estopped from challenging such decree on appeal. However, that case involved a remarriage and is easily distinguishable from the case at bar. Here the appellant sold a car after the trial court rendered its decree and it is this act alone which appellee alleges constitutes an acceptance of the benefits.

It is true that the acceptance of *financial* benefits accruing to a spouse from the granting of a divorce may in some cases estop that spouse from the prosecution of an appeal. *Finke* v. *Finke* (1963), 135 Ind. App. 65, 191 N. E. 2d 516; *Smith* v. *Smith* (1955), 125 Ind. App. 658, 129 N. E. 2d 374. However, there are obvious limitations to this theory where the acceptance of certain financial benefits is the *only* evidence available to support the proposition that a spouse has unqualifiedly accepted the benefits of the decree and hence is precluded from appeal. For example, if a wife is awarded the title to the family home pursuant to a divorce decree, is she to be precluded from living in the house if she wishes to prosecute an appeal on some aspect of the judgment? Likewise should the spouse who was awarded a mechanically defective automobile be required to retain possession of that car even where such possession is sure to result in unreason-

ably high repair bills? Should a spouse who has been awarded stock be required to hold on to such stock in spite of the fact that it has begun to decline in value? To require a spouse to incur *liabilities or losses* in order to be free of an allegation of accepting the benefits of a divorce decree is an anomaly indeed. Likewise, a requirement that possession of all assets, regardless of their nature, be frozen in the spouse to which they are awarded if an appeal is contemplated is unreasonable, unrealistic and unnecessary. Appeals often take considerable time, a fact to which this case, from trial through appeal, will bear witness. Certainly the rule does not and should not require that in the interim a spouse be unreasonably hampered by the denial of the right to make those dispositions of property required as a normal incident of everyday life.

It is the considered opinion of this court that to constitute an acceptance of the benefits of divorce so as to preclude an appeal, the benefits "accepted" must be of such a nature as to clearly indicate an intention on the part of that spouse to be bound by the divorce decree. Remarriage is without doubt an acceptance of the benefits which clearly falls within the rule. Where there is no remarriage, however, the facts and circumstances of each case must control in determining whether there is a positive acceptance of the financial benefits precluding appeal. Factors to be considered are the very nature of the "benefit" and its relation to the parties of the divorce, the likelihood that such "benefits" will be dissipated and the use to which such "benefits" are put by the spouse to which they are awarded.

Here, appellant sold a car. Considering the nature of the property and the facts and circumstances of this case against the factors as above outlined, we cannot say that the mere sale of the auto without more is sufficient action to estop an appeal.

A second ground for transfer is that the Appellate Court failed to give a statement in writing of each substantial ques-

tion arising on the record as included in appellant's brief. First, we note that the Appellate Court reversed the trial court, thereby making it unnecessary to cover all points raised. Secondly, strange as it may seem, *appellee* is here complaining that the Appellate Court failed to discuss all of *appellant's* assignments of error. We can readily see how a failure to do so could prejudice the appellant, but it remains a legal mystery to this court to envision in what way a failure to discuss the points raised by appellant in urging a reversal of the cause could prejudice appellee nor does appellee attempt to so establish such prejudice as required by Supreme Court Rule 2-23 (c).

Finally, appellee urges transfer of the cause on the grounds that the Appellate Court erroneously decided a new question of law in that they held that an award for attorney fees to a successful wife in the trial court was no longer proper where the cause in chief was reversed. On this point, the court is much indebted to counsel for Amicus Curiae, Charles W. Ardery, Jr., for the fine brief submitted, also to both Charles W. Ardery, Jr., and John M. Kitchen for their participation in oral argument before this court.

To begin our discussion we turn first to the applicable statute on this point, Ind. Ann. Stat. § 3-1216 (1968 Repl.) which reads in pertinent part as follows:

"Pending a petition for divorce, the court, or the judge thereof in vacation, may make, and by attachment enforce, such orders for the disposition of the persons, property and children of the parties as may be deemed right and proper and such orders relative to the expenses of such suit and attorney fees as will insure to the wife an efficient preparation of her case and a fair and impartial trial thereof. And, on decreeing a divorce in favor of the wife or refusing one on the application of the husband, the court shall, by order to be enforced by attachment, require the husband to pay all reasonable expenses of the wife in the prosecution or defense of the petition including a reasonable sum for services of the attorney representing such wife which sum for attorney fee shall be payable direct to said attorney and

the order for same shall be in the name of said attorney, when such divorce has been granted or refused: . . ."

At the outset we note that the statute covers two distinct situations, the first being where the court grants a *pendente lite* order for the attorney fees. The granting of same ■ is within the discretion of the trial court and they are usually granted after a consideration of such factors as the needs of the wife and the ability of the husband to pay. *Crowell* v. *Crowell* (1942), 219 Ind. 472, 39 N. E. 2d 602; *Hetherington* v. *Hetherington* (1928), 200 Ind. 56, 160 N. E. 345; *Snider* v. *Snider* (1913), 179 Ind. 583, 102 N. E. 32; *McCue* v. *McCue* (1897), 149 Ind. 466, 49 N. E. 382; *Harrell* v. *Harrell* (1872), 39 Ind. 185. The second situation is where a divorce has been granted in favor of the wife or refused on the application of the husband, and it is with this situation that we are here involved.

The Appellate Court held that the power of the court to award attorney fees upon the granting of the divorce decree was statutory and that only when the wife was awarded the decree or the husband refused a decree was there authority to make the award. Since the wife had been improperly awarded the divorce and that decision was being reversed, the Appellate Court reasoned that the award of attorney's fees was, therefore, improper and must also be reversed. This result does not necessarily follow.

Such a position presupposes two rules of law. First of all, it presupposes that upon a final decree the wife is entitled to the fees *only* if she succeeds in the trial court or the husband fails in his action. Secondly, it assumes that should the fees be properly awarded the wife on the trial court level and the Appellate Court reverses the cause in chief, then the award of attorney fees is no longer proper.

As to the first supposition, there is case law in support of that view. The Appellate Court initially decided the question in *Fites* v. *Fites* (1916), 62 Ind. App. 396, 112 N. E. 39, in

which that court held that since there was no power inherent in the common law to award fees for services rendered by attorneys, it came to the trial court solely by virtue of the statute. Consequently, on a final decree, an allowance could only be made as specified by the statute. *Fites* was followed by *Hart* v. *Hart* (1929), 90 Ind. App. 220, 168 N. E. 492 and *Fordice* v. *Fordice* (1956), 126 Ind. App. 562, 132 N. E. 2d 618, on which the Appellate Court in the instant case relied.

These cases are in error for the following reasons. In *Fites* v. *Fites, supra,* the Appellate Court held, as we have already noted, that there was no common law right to an award but such right arises only by statute. However, this court has held that a *pendente lite* order is founded on the common law obligation of the husband to support his wife. *Snider* v. *Snider, supra.* To the same effect is *Crowell* v. *Crowell, supra,* and *State ex rel. Sims* v. *Hendricks Circuit Court et al.* (1956), 235 Ind. 444, 134 N. E. 2d 211. Admittedly these cases involve appeals from an award for attorney fees while the action was still pending. There would seem, however, to be little reason for drawing a distinction between a situation in which the wife applies for the allowance while the case is pending and the wife who waits until the completion of the suit. If it can be said that the right to an allowance is based on the common law right to support, the timing of the request should be of no consequence. Certainly the facts and circumstances which might convince the trial judge to make a *pendente lite* order for attorney fees, could be just as convincing where no application for such an award is made until the decree is final.

The only limitation on this approach would seem to be that the order for fees must be included as a part of the final decree, since once the decree becomes final it would appear that all obligations relative to the common law duty to support cease except as specified by the decree itself.

Having found that there is a legal basis other than express

statutory authorization for the awarding of attorney fees, it no longer follows that § 3-1216, *supra,* automatically precludes the awarding of such fees except where the wife is successful or the husband unsuccessful. The *Fites-Hart-Fordice* line of cases assumes that the alternative to the mandate ". . . the court shall" is shall not. We would hold however that § 3-1216, *supra,* does not *forbid* the awarding of fees to the wife in situations other than specified by the statute, but where a situation other than those set out by the statute does in fact exist, the award of fees should be controlled by the same considerations which control a *pendente lite* order of the court.

Such a construction would seem to be consistent with the intent of the legislature as expressed in the first provision of the statute which provides the wife with fees for the prosecution or defense of her cause if she needs them and if the husband can afford them. It would also obviate the necessity of going to the lengths deemed necessary in *Mendenhall* v. *Mendenhall* (1945), 116 Ind. App. 545, 64 N. E. 2d 806, where the Appellate Court justified the awarding of fees to the unsuccessful wife in the final decree on the grounds that they were merely a supplement to the "partial allowance" awarded by the *pendente lite* order under the first provision of § 3-1216. Why should the law *as a matter of course* deny a wife who loses her case the right to attorney fees simply because the result was unfavorable to her? We can see no justifiable reason, and hold therefore that the awarding of fees in situations which are not covered by the second provision of § 3-1216 is to be discretionary with the court.

Clearly, this is not to say that an award *must* be made to the successful wife and this court has so held:

". . . It is to be noted that in prescribing the duties of the court the statute uses the word 'shall,' which ordinarily imports an imperative, rather than a directory, obligation. *State, ex rel.* v. *Meeker* (1914), 182 Ind. 240, 105 N. E. 906. Notwithstanding the positive language

of the statute, we are of the opinion that it must have a liberal and practical construction. It is conceivable that cases may arise where a wife and her attorney, for reasons best known to them, may not wish to have an order against the husband for attorney's fees. It could hardly be contended that they would be required to accept the benefits of the act, which are solely for their use, against their desires. It may also be observed that the statute contemplates that the fee which shall be allowed in favor of the wife's attorney shall be reasonable. There may be instances where the financial situations of the parties are such that any allowance against the husband would be unreasonable and unjustified. There must therefore be read into the language of the statute a proviso to the effect that the court shall make the order provided for if a timely and proper application or petition is presented and the facts justify an allowance. This seems imperative in view of another provision of the statute, which directs that an allowance shall be made for the reasonable expenses of the wife in the prosecution or defense of her cause of action." *State ex rel. DeArmond* v. *Superior Court of Madison County et al.* (1939), 216 Ind. 641, 642-43, 25 N. E. 2d 642, 643-44.

Turning to the case before us, it is evident that the award of the attorney fees to the wife, even though the effect of the Appellate Court's reversal is to make her the unsuccessful party, may still be held to be proper where there is no showing of an abuse of discretion. Since there is no such showing here, we hold that the award of the fees was proper and hold that such an award need not be disapproved merely on a reversal of the cause in chief. All cases contra are expressly overruled.

Thus concludes our discussion of appellee's three grounds for transfer. Having accepted transfer on the basis that the Appellate Court erroneously decided a new question of law relative to the award of attorney fees, we now direct our attention to the Appellate Court's application of the well established principle of domestic law, the doctrine of recrimination, in order to determine whether this court can any longer sanction the use of that rule of law. Such a

discussion on application for transfer is authorized by holdings of this court:

> "Transfer to this court was accepted because of the enunciation of the erroneous principles of law contained in the opinion of the Appellate Court, as heretofore discussed. Having accepted transfer of the case, this court is obliged to consider the case as if it were originally presented to this court on appeal. Under such circumstances its consideration of the case is not limited to the issues presented by the petition to transfer. Burns' Ann. St. § 4-215 (1946 Repl.) *Southern Ry. Co.* v. *Ingle* (1946), 117 Ind. App. 229, 69 N. E. 2d 746; *Kraus* v. *Lehman* (1908), 170 Ind. 408, 83 N. E. 714, 84 N. E. 769; *Payne* v. *Terre Haute, etc. R. Co.* (1902), 157 Ind. 616, 62 N. E. 472." *Chesapeake & Ohio Railway Co.* v. *Burk* (1961), 241 Ind. 683, 691, 175 N. E. 2d 137, 139.

It would thus appear that once transfer is granted, our scope of review is limited only to the extent limited in the Appellate Court. Appellant, in his motion for new trial alleges that the trial court decision is contrary to law. In the accompanying memorandum appellant points to the evidence of adultery on the part of his wife and cites cases which hold that a spouse is to be denied a divorce where it is shown that such party is guilty of adultery. Plainly the rule of recrimination was invoked by appellant on appeal and that issue is now clearly before this court on transfer under the above cited authority.

The doctrine of recrimination is by no means new to the law of domestic relations. The doctrine, according to Lord Stowell in *Forster* v. *Forster* (1790), 1 Hagg. Con. 144, 161 Eng. Rep. 504 was based on the Roman law called *compensatio criminum*. The Roman magistrates applied the rule only to property rights. It was often invoked when the husband pleaded the wife's adultery as a defense to her application for repayment of her dowry, since its application allowed the wife to defeat this defense by showing the husband's own adultery. The doctrine apparently grew out of attempts to penalize the

husband who had assumed the wife's dowry as part of his own estate, yet failed to provide support or separation money to the wife upon divorce. It was never used as a bar to divorce. For a history of the doctrine see Beamer, Recrimination in Divorce Proceedings, 10 Kan. City L. Rev. 213 (1942).

*Forster* v. *Forster, supra,* is apparently the first English case to adopt the doctrine. At that point in time the application of the concept was not too great an extension of the Roman version, since the primary consequence generally was to require the husband to continue supporting the wife, there being no absolute divorce in the English ecclesiastical law. Passage of divorce statutes in this country resulted in the adoption of the English common law on the subject, of which recrimination was found to be a part. It was apparently at this juncture that recrimination was transformed into a bar to divorce. Consequently a doctrine which was originally employed to guarantee the wife support, has evolved to the extent where it now constitutes an absolute bar to divorce in some states where the complaining party is found to be guilty of a statutory ground for divorce. See 170 A. L. R. 1076 and the cases there cited.

Various jurisdictions throughout the country have adopted several legal theories to support the rule of recrimination, the most common of which is the "clean hands" doctrine. Other rationalizations include an assertion that the parties are in *pari delicto, compensatio criminum,* breach of mutual dependent covenants and the assertion that divorce is a remedy for the innocent spouse alone. Clark, Law of Domestic Relations 374 (1968), and authority there cited. Regardless of the theory involved, the result is the same. If the result can no longer be justified, the doctrine should be struck down regardless of its historical-legal basis.

According to Clark, over half of the states have embodied the judge made rule of recrimination in statutes. Many of these provide that adultery on the part of the plaintiff is a

defense to a divorce action brought on that ground. Indiana's own statute is a good example. Ind. Ann. Stat. § 3-1202 (1968 Repl.). However, many states have extended the rule beyond the limits of such a statute to hold other marital offenses to be equally effective as a bar to divorce. Again, Indiana is a good example of this practice, as shall be later pointed out.

Ind. Ann. Stat. § 3-1202 (1968 Repl.) provides in pertinent part:

> "Divorces shall not be granted for adultery in any of the following cases: . . .
>
> Third. When the party seeking the divorce has also been guilty of adultery under such circumstances as would have entitled the oppostie party, if innocent, to a decree."

The statute was originally passed in 1873 (Acts 1873, ch. 43, § 9, p. 107) but the doctrine had already been recognized by case law.

Probably the first such case in Indiana to invoke the rule is *Christianberry* v. *Christianberry* (1833), 3 Blackf. 202. The *scope* of the rule's application was announced in *Alexander* v. *Alexander* (1894), 140 Ind. 555, 38 N. E. 855, where the court quoted at page 559 from Browne, *Divorce,* p. 85:

> " 'Where each of the married parties has committed a matrimonial offense, which is a cause for divorce, so that when one asks for this remedy, the other is equally entitled to the same, whether the offenses are the same or not, the court can grant the prayer of neither.' "

It seems quite apparent that our courts refused to be limited by the statute when applying recrimination. The exact reason for so extending the rule is not readily discernible. It would appear that the courts had adopted the "clean hands" doctrine as evidenced by *Eward* v. *Eward* (1919), 72 Ind. App. 638 at 646, 125 N. E. 468:

> ". . . In order that the appellee may prevail in this suit, he must not only be the injured party, *but also the innocent*

*party,* for divorce is a remedy provided for the innocent party, and, if such party himself is guilty of a statutory offense, he cannot prevail. Stewart, Marriage and Divorce § 314." (our emphasis)

Applying the "clean hands" rationale, the courts quite obviously felt no compulsion to stay within the statutory limits. Possibly this attitude developed from the belief that society has a vital interest in the preservation of the marriage relationship and that divorce should be discouraged. The epitome of this very rationale is shown in the case of *Eikenbury* v. *Eikenbury et al.* (1904), 33 Ind. App. 69, 70 N. E. 837, where this court held that society's stake in the marriage relationship justified the trial court, on its own prerogative, in eliciting evidence from the petitioner as to her own adultery. Having verified petitioner's adultery, the trial court then refused to grant the divorce. This court stated:

> "As the marriage relation is of public concern, so divorce is of public concern. Public policy, good morals, the interests of society, all require that divorces shall be discouraged by the law, and that reconciliation should be effected if practicable or possible. The policy of the law in all Christian countries has been against divorce, except for adultery . . . The legislature declares the reasons for which divorces may be granted, and a party within the statute should be granted the relief there given. And while a divorce statute should not be construed in a spirit of improper liberality, nor with a view to defeat its ends, yet it should be construed strictly." *Eikenbury* v. *Eikenbury, supra,* at 72-73.

Many cases, since those which we have here cited have been decided which have continued to espouse the doctrine of recrimination as an absolute bar in divorce actions. See e.g. *Blue* v. *Blue* (1966), 139 Ind. App. 645, 218 N. E. 2d 370; *Haverstock* v. *Haverstock* (1965), 246 Ind. 426, 206 N. E. 2d 368; *Sims* v. *Sims* (1957), 128 Ind. App. 408, 146 N. E. 2d 111; *Stinson* v. *Stinson* (1947), 117 Ind. App. 661, 74 N. E. 2d 745; *Smiley* v. *Smiley* (1943), 114 Ind. App. 138, 51 N. E. 2d 98; *McMurrey* v. *McMurrey* (1936), 210 Ind. 595, 4 N. E. 2d 540.

Some states have by statute or case law held that the doctrine should be applied at the discretion of the court. E.g., *Stewart* v. *Stewart* (1946), 158 Fla. 326, 29 So. 2d 247; *Roberts* v. *Roberts* (1918), 103 Kan. 65, 173 P. 537; *Panther* v. *Panther* (1931), 147 Okl. 131, 295 P. 219; *DeBurgh* v. *DeBurgh* (1952), 39 Cal. 2d 858, 250 P. 2d 598; *Bissell* v. *Bissell* (1955), 129 Mont. 187, 284 P. 2d 264. Perhaps the leading case is *DeBurgh* v. *DeBurgh, supra,* where Judge Traynor points out that the granting of discretion to the trial court in the application of recrimination is in the best interests of society. We shall elaborate on that point later in this opinion.

Having discussed the historical aspects of the doctrine as well as its current status in this state, we next address ourselves to a review of the rule's justification. As we have noted, the rules' application has been largely based on the theory that a spouse must be innocent before that party can obtain a divorce, i.e., enter the court with "clean hands". Several writers have questioned the appropriateness of the clean hands doctrine in divorce laws:

"It was an evil day when the first American judge to speak of clean hands [Mattox v. Mattox (1826) 2 Ohio 233] had the bright idea of injecting the maxim into the very place where it would work its greatest mischief. In dealing with a marriage, judges have an especially strong duty to look at the total situation, and not let the result turn on the ethical behavior of a single individual. Marriage does not involve just one person. Indeed, most of its difficulties as well as its delights come from the basic fact that it takes two to make a marriage . . . I am certainly not qualified to say which considerations ought to prevail in any case, but what I do say is that a judge has enough to do if he forces himself to be aware of all these interests and policies and do his best to evaluate them with reference to the whole family. He cannot afford to waste his efforts on deciding how to punish one person who happens to be the plaintiff. He is asked to reorganize the family, and not to try an offender . . . The clean hands maxim is an impertinent intrusion on a very difficult and important judicial job." Chafee, Some Problems of Equity, 73, *et seq.* (1950).

We also noted that such an application was apparently rationalized on the grounds that the state, as an interested party, should discourage divorce. A re-examination of that position makes readily apparent the fallacious assumption upon which it is based. The assumption that the state's interests can best be preserved by discouraging divorce presupposes that if the divorce be denied more "good" will accrue to society than if one be granted. However that may not, as a matter of fact, be the case. Marriage is the basic unit of our society. Through the institution of marriage, biological drives are directed into channels of socially accepted activity; it encourages the exercise of intimate affections on a most personal basis; children are theoretically provided with a stable environment; a means is provided by which such children might be reared and educated; individual initiative and self reliance are nurtured; family continuity from generation to generation is established. The institution of marriage is without doubt, at the very foundation of our society and the law has a vested interest in preserving its sanctity.

The state nevertheless has acknowledged that in certain instances where a "marital offense" has been committed by one of the parties, the interests of all are better served to permit a termination of the union. Certainly if such be the case where *one* party is guilty, so much more is the case where *both* parties are guilty. It is often in this situation that the objectives of the institution have the least chance of being realized. The family relationship has been, in all probability, completely disrupted. The preservation of the union may encourage adulterous relations. Children may be subjected to continual bickering between the parents. In short the legitimate objectives of marriage are destroyed. Notwithstanding, this court in blindly applying precedent has made a mockery of marriage by perpetuating the relationship, the effect of which can only be to punish all parties concerned. The interests of society are by no means served ("If the law supposes that," said Mr. Bumble, "the law is a ass, a idiot." Oliver Twist). Rather

society, as a consequence, is made a party to the spectre personifying man's inhumanity to man on the most basic and personal level. Justice need not be blind, especially where the interests of society are so closely intertwined with those of the litigants.

In addition to the foregoing, the rule of recrimination is often prostituted by the parties themselves. A strict rule of recrimination may be circumvented by the connivance of the parties. Where both parties are guilty one party might sue with the understanding that the other party will not contest the action. Thus if the purpose of the rule is to deny the guilty party relief, that objective can be completely frustrated. Also it is conceivable that one of the parties, where both are admittedly guilty, might use the other party's guilt as an unscrupulous bargaining tool to obtain substantial financial concessions in arriving at a property settlement. His silence in an uncontested divorce action would insure that a divorce be granted, providing of course that statutory grounds are available. Should he not be satisfied with the course of events, however, he can contest the action with the result that the divorce be denied both. Thus the party desperately seeking a divorce may effectively be denied same by what amounts to judicially sanctioned blackmail even though the relationship is hopelessly beyond repair.

Two examples should suffice to demonstrate the absurdity of the results reached when the rule of recrimination is indiscriminately applied. An often cited case for this purpose is *Wells* v. *Wells* (1962), 73 N. J. Super. 545, 180 A. 2d 356. In that case the plaintiff, after having been deserted by his wife for eleven years, remarried on the good faith belief that his first wife was dead. Several years after this second marriage, the first wife turned up so plaintiff-husband sued her for divorce, continuing to live with his second wife. The suit was uncontested but the court, on its own motion, held the husband guilty of adultery and denied the divorce on the ground of recrimination. (Fortunately the case was later

reversed, 41 N. J. 594, 198 A. 2d 442). Another such case comes from England, *Pullen* v. *Pullen* (1920), 123 L. T. R. 203, 36 T. L. R. 506. The husband was married in 1912. Approximately three years later he enlisted and was sent with his battalion to Egypt. In July, 1917, he received a letter from his wife in which she admitted having committed adultery and that she had gone away with her paramour. Later it was reported that she bore the man's child. When Pullen returned from Egypt he was unable to locate his wife. After being demobilized in 1919 he met one Miss Greatorex and thereupon sued for divorce. Immediately afterwards he committed adultery with this woman, it being his first infidelity to his vanished wife. They continued to live together as husband and wife, both desiring to get married. Although the judge had discretion in granting the divorce, it was refused on the grounds of public morality as embodied in legal precedent.

Needless to say, we need not look to other jurisdictions to point out such unjustifiable results. Similar cases have been decided in Indiana. However, this court is reluctant to indulge itself in judicial masochism where its own opinions are involved.

A few jurisdictions have taken the position that where both parties to a divorce action are guilty of misconduct for which a divorce could be granted, the divorce decree may be granted to the party least at fault. The doctrine of comparative rectitude, as it has become known, operates to mitigate the effects of the rule of recrimination. See annotations at 63 A. L. R. 1132 and 159 A. L. R. 734 with cases there cited. A blanket application of this rule would seem to be less than desirable. Although we have recognized that courts often go to unusual extremes to preserve the marriage at the expense of all concerned, nevertheless, we would also assert the proposition that society, as an interested party, should not, through its courts, operate as a rubber-stamp, approving *all* divorces in the name of *expediency*. A framework must be established by

which the facts of each case can be made the determinative factor. Certainly the comparative fault of each party will not be without significance.

It would thus appear to this court that the application of recrimination as an absolute bar to divorce is no longer defensible. Likewise the wholesale granting of divorce will not be in the best interests of the community and will not be sanctioned by this court. Consequently, where the evidence shows that both parties have committed marital offenses it shall be within the sound discretion of the trial court to determine whether a divorce should be granted. Where the divorce is contested, the court shall determine if a divorce should be granted *and* to which party.

Some factors which should be considered in making this determination have been pointed out by Judge Traynor in *DeBurgh* v. *DeBurgh, supra,* at page 606:

"1. *The prospect of reconciliation.* The court should determine whether the legitimate objects of matrimony have been destroyed or whether there is a reasonable likelihood that the marriage can be saved. It should consider the ages and temperaments of the parties, the length of their marriage, the seriousness and frequency of their marital misconduct proved at the trial and the likelihood of its recurrence, the duration and apparent finality of the separation, and the sincerity of their efforts to overcome differences and live together harmoniously.

2. *The effect of the marital conflict upon the parties.* If a continuation of the marriage would constitute a serious hazard to the health of either party, as in the case of physical brutality, the court should be reluctant to deny divorce. Although financial considerations can play only a minor role in determining the propriety of divorce, even these may not be entirely ignored if the evidence indicates that marital conflicts are destroying the livelihood of the parties.

3. *The effect of the marital conflict upon third parties.* In every divorce case in which children are involved, their interests are of the utmost concern to the court. The disruptive effect of divorce upon children is to be deplored, but in a given case it may be preferable to violence, hatred, or immorality when these are present in the home. The community as a whole also has an interest. Adultery, deser-

tion, or cruelty, for example, can only discredit marriage; their perpetuation is not lightly to be decreed.

4. *Comparative guilt.* In many ways the guilt of the parties may be unequal—in the gravity of the misconduct involved, in the frequency of its occurrence, or in its ▮ effect upon children and others. Moreover, one spouse may demonstrate substantially greater repentance and reform. Marital offenders, therefore, are not necessarily in pari delicto before the chancellor. Their comparative guilt may have an important bearing upon whether or not either one or both should be granted relief."

We wholeheartedly adopt this view as being a realistic approach to the problem of divorce and hold that henceforth such considerations shall govern the trial courts in granting a divorce.

Note should be made that recrimination has been adopted by our *courts* in all respects *except* where a party sues for divorce on the ground of adultery and the party so ▮ suing is also shown to be guilty of adultery. In that situation, it appears that the legislature intended that no divorce is to be granted. Admittedly the words "shall not" are incorporated in the statute. See statute § 3-1202 as set out earlier in this opinion. We have already noted however that the court should give a practical construction to such positive language where it is readily apparent that the situation demands such a construction. *State ex rel. DeArmond* v. *Superior Court of Madison County, supra.* However it should be clearly understood that in this one instance the legislature has made a clear policy statement which should be effected by the courts to the extent equitably conscionable.

Turning to the case at bar the appellee-wife sued for divorce on the grounds of cruel and inhuman treatment. Appellant cross-complained on the same grounds. The trial court found for the wife on her complaint and granted the divorce. However, as the Appellate Court noted, she was not an "innocent party". The undisputed evidence shows that she spent two

nights at a motel in Milwaukee, Wisconsin, in the same bed with a man other than her husband. Despite her testimony that they "kissed, nothing more", we note that the man paid her traveling expenses to Milwaukee. Considering the facts and circumstances it seems reasonable to infer that he may have anticipated and been rewarded with slightly more than kisses. Otherwise human nature is inconstant and the method of inductive reasoning utterly fallacious. *Waugh* v. *Waugh* (1874), 47 Ind. 580. It remains a mystery why the trial court failed to take this evidence into account. Possibly his decision represents a *de facto* application of the doctrine of comparative rectitude. Obviously that question is now moot, but yet interesting since the decision is but another example of the attempts made by trial courts to obviate the harshness of the rule of recrimination.

In light of the new principles enunciated herein we hold that the judgment of the trial court should be reversed and the appellant's motion for a new trial should be sustained. At a new trial the court will have the opportunity to properly weigh all factors against the pertinent considerations outlined in this opinion. The court will no longer be under a *compulsion* to deny a divorce simply because of the doctrine of recrimination, the absolute application of which we have herein laid to final rest.

For all of the foregoing reasons this cause is reversed on the merits and is hereby remanded to the trial court for further proceedings not inconsistent with this opinion. The trial court's judgment on attorney fees is affirmed.

Judgment reversed in part and affirmed in part.

DeBruler, C.J., Arterburn and Givan, JJ., Concur. Jackson, J., Dissents.

NOTE.—Reported in 253 N. E. 2d 250.