CHARLES WAYNE ADAMS *v.* STATE OF INDIANA.

[No. 369S41. Filed July 19, 1971. Rehearing granted July 25, 1972.]

*C. W. H. Bangs, H. D. Rollo, Bangs, Mills & Rollo,* of Huntington, for appellant.

*Theodore L. Sendak,* Attorney General, *Robert F. Hassett,* Deputy Attorney General, for appellee.

ARTERBURN, C.J.—Defendant was charged in Huntington Circuit Court with the crime of first degree murder; venue of the cause was changed to Grant Circuit Court. Defendant pleaded not guilty to the charge and specially pleaded that he was of unsound mind at the time the crime was committed. The jury found the defendant guilty of first degree murder and assessed the penalty to be death.

Briefly, the facts relative to the issues presented in this case are as follows. On July 27, 1968, Burl Lyles, nicknamed Joe, accompanied by a female companion, at approximately 10:30 p.m., left a softball game they had attended and proceeded to a rural road where they parked. After being parked for about ten to fifteen minutes a car pulled in behind their car. Someone from the second car yelled out the window and asked if they had seen a certain car go by. Joe Lyles responded that he had not. Observing that a headlight of the second car was unlit, Joe Lyles informed the driver of the condition. Having left his car Joe Lyles reentered his car, at which time a shot was fired from the second car, followed by a second shot. After the second shot the occupant of the second car approached Joe Lyles' car and told the girl to get out of the car or he would kill her. The defendant then forced her to get into the trunk of the second car. He then drove from the scene of the shooting. After approximately twenty minutes the defendant parked the car and released the girl from the

trunk. He then led her from the car and raped her. Thereafter she attempted to flee and he stabbed her in the back with a knife. He then placed her in the car and attempted to leave but discovered his car was stuck. They spent the rest of the night in the car. The following morning the defendant went to a farm and got a farmer to pull his car out, and then took the girl to the Huntington County Hospital and left her. On the morning of July 28, Joe Lyles was found dead in his car parked on the rural road where he had parked it the night before with his girl companion. The cause of Joe Lyles death was attributed to a bullet wound in the head. On July 31, 1968, at approximately 2:00 p.m., the defendant went to the residence of Mr. and Mrs. Dennis Brown. No one was present when the defendant arrived but later Mrs. Brown returned home with her children. The defendant forced Mrs. Brown into a bedroom and raped her. Thereafter, the defendant decided that he wanted to give himself up and requested Mrs. Brown to call the police, which she did. The first police officer to go to the Brown residence was Whitley County Deputy Sheriff Harold Lewis, who took the defendant into custody. Shortly thereafter, State Police Officers Melvin Wall and William Shockley arrived. Officer Wall arrived first and handcuffed the defendant and placed him in his police car. When Officer Shockley arrived the defendant was turned over to him, whereupon Officer Shockley read a standard warning and waiver of constitutional rights form to the defendant. The defendant was taken to the Huntington County Prosecutor's Office at approximately 3:45 p.m. at which time another alleged warning and waiver form was read to the defendant by the prosecutor in the presence of Officer Shockley. At about 6:00 p.m. the defendant was taken to the Huntington Police Station to be fingerprinted. The defendant was placed in jail overnight. The following morning at approximately 10:30 a.m., August 1, 1968, the defendant was taken before Judge Mark McIntosh, Judge of the Huntington City Court, where he was preliminarily charged with first degree

murder. On August 5, 1968, the Huntington County Grand Jury filed an Indictment charging Charles Wayne Adams, the defendant, with first degree murder. In addition to a general plea of not guilty the defendant made a special plea of not guilty by reason of being of unsound mind at the time of the commission of the crime. The court appointed two disinterested physicians to examine the defendant.

During the course of the trial, no statements or evidence obtained by use of any statements made by the defendant were introduced as evidence by the State. A .22 caliber rifle, turned over by the defendant at the time of his arrest, was introduced and admitted into evidence. State Police Officer Houck testified that two empty cartridge cases which had been found at the murder scene were fired from the rifle which the defendant turned over at the time of his arrest. In the course of her testimony the raped girl identified the defendant as the man who had fired the shots and raped her. Mrs. Brown also identified the defendant as the man who had raped her. State Police Officer Shockley testified only that he had arrested the defendant and warned him of his rights; he offered no testimony relating to any statements made by the defendant after his arrest.

Appellant first urges that his constitutional rights were violated. Specifically, he urges that he was not given the warning as to his constitutional rights as required by *Miranda* v. *Arizona* (1966), 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, that he was interrogated while in custody immediately following his arrest and that he was not promptly taken before a magistrate following his arrest. The facts and the law do not support the appellant in this contention. The record clearly shows that appellant was fully informed of his constitutional rights when he was first taken into custody at the Brown home, where the second rape occurred. The evidence goes further to show that he was given another warning in the Prosecutor's Office although the Court for some reason excluded the testimony as to that warning.

The evidence further shows that the appellant was taken into custody at 3:45 p.m., on July 31, 1968, and was taken before the Judge of the Huntington City Court the following morning, about 10:30 a.m., and preliminarily charged with first degree murder. This time lapse does not exhibit any unnecessary or prejudicial delay.

Finally, we point out that the record shows that the State did not offer into evidence any statements elicited from the appellant during interrogation, while in custody. The appellant, however, urges that although the statements were not used in evidence the inference may be drawn that the interrogation was helpful in gathering other evidence and therefore would constitute "poison fruit" resulting from such interrogation. The *Miranda* v. *Arizona* (1966), 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, and *Escobedo* v. *Illinois* (1964), 378 U. S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977 rules are exclusionary and have no application here. There is no record in the case that the appellant objected to any specific evidence being introduced as "poison fruit" nor is there any record showing that the appellant asked to introduce evidence as a basis for making an objection to evidence and excluding the same. We find no prejudicial error on the grounds urged by the appellant, this Court has previously stated that:

> "One cannot claim error for an abstract violation of a constitutional right where he shows no injury."
> *Layton* v. *State* (1968), 251 Ind. 205, 240 N. E. 2d 489, 494.

The appellant next contends that the State did not prove the sanity of the defendant, and that its evidence showed only that the appellant was of unsound mind. First we note, the State was under no duty to introduce evidence of the appellant's sanity in its case in chief, *Brattain* v. *State* (1945), 223 Ind. 489, 61 N. E. 2d 462. However, the State did introduce considerable evidence on the issue of the appellant's sanity. Although, the State did

not introduce the testimony of any psychiatrists, it did introduce considerable lay testimony on the issue. We have held that lay testimony on the issue of insanity is competent evidence for the trier of the fact to consider, *Johnson* v. *State* (1971), 255 Ind. 324, 264 N. E. 2d 57. The State offered the following testimony relative to the issue of the appellant's sanity. On July 26, 1968, two days before the murder, Dennis Brown stated that he noticed nothing different about the appellant or the way in which he was conducting himself, when he talked with him on that date. Bernice Wardwell, a waitress at a restaurant, testified that she talked with the appellant about 11:00 a.m. on July 28, 1968, the morning following the murder. She testified that the appellant quietly ate his breakfast. "He was polite, said thank you" and just seemed normal. J. D. Meyers and William Lee Patrick, two fishermen, who talked with the appellant at the first rape scene, while the appellant's car was still stuck, testified that there was nothing peculiar or out of the way about the appellant. Cyril Burns, the farmer who pulled the appellant's car out, testified that he did not notice anything different or unusual about the appellant; he even offered to pay him for pulling him out. The girl who was raped testified that after the rape appellant was very calm and collected and seemed intelligent, that his actions were intelligent. That after the rape, he stopped to get some water for the car radiator to cool it off. That he spread sheets around the car so no one could see the blood. That on driving her to the hospital, he was calm and friendly. H. June Mishler owner of a trout fishing pay pond, testified that on July 26, 1968, two days before the murder, the appellant was fishing at his pond and caught six to eight fish. Ruth Broom, an employee of a grocery, testified that on July 27, 1968, at about 11:00 a.m., the appellant purchased a flashlight and batteries at the store, described him as just friendly, that he caused no trouble and nothing attracted her attention. Absent any expert testimony there was a considerable amount of evidence presented by the State on the

issue of the appellant's sanity, from which the jury could conclude that the appellant was of sound mind when he committed the murder. After the close of all the evidence, the court called the court-appointed psychiatrists to give their opinion as to whether the appellant was of sound mind when he committed the murder. Doctor Henry Alderfer, the first physician to testify stated, ". . . but I believe that perhaps that he did not have the ability to refrain from this act of murder." The second physician to testify, Doctor Larry K. Mussleman, stated that he did not have an opinion. In the instant case there was sufficient evidence from which the jury could conclude that the appellant was of sound mind when he committed the murder and the appellant's contention must fail.

Appellant next contends that he was deprived of a fair trial by reason of the exclusion of jurors who were "peremptorily" challenged by the State because they had conscientious objections to the death penalty. It is to be noted that this is not a challenge of a juror for "cause" that was sustained by the Court. A peremptory challenge may be for no cause whatsoever, Burns § 9-1502, 1503, and 1504. We point out in addition that the appellant has failed to include in the transcript the voir dire examination of the jurors and the record does not present such question for review. We stated in *Nix* v. *State* (1960), 240 Ind. 392, 396, 166 N. E. 2d 326, 328, where the voir dire examination of witnesses was in issue: "The necessity of having before us the voir dire examination in a case of this kind is emphasized by the very nature of the question and answer presented . . ." Additionally, in the *Nix* case we stated: "In the absence of stenographic notes of the voir dire examination the parties could have stipulated the substance of all the questions and answers of this juror taken upon the voir dire and the same could have been settled as a special bill of exceptions by agreement or by the judge." In *Witherspoon* v. *Illinois* (1968), 391 U. S. 510, 88 S. Ct. 1770, 20 L. Ed. 776, the Supreme Court of the

United States set forth specifically the instance when the State could challenge a juror for cause, where the juror has a conscientious objection to the death penalty. The Court stated: "Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (391 U. S. at 522). Thus, it can be seen why it is necessary for the transcript to include the voir dire examination of the witnesses. Without the voir dire examinations before us, it is impossible for us to determine the nature of the objection to the death penalty made by any veniremen. For the reasons stated above the question is not properly presented for review.

The appellant also contends that he was denied a fair trial because the prosecutor inflamed the jury by waving a picture of the decedent before the jury and with great passion demanded the death penalty which resulted in the death penalty. For the reasons stated above, there is no record before us of such alleged acts, the appellant failed to preserve the question for review on appeal. We, however, are not impressed with the alleged error as contended.

Next, the appellant contends that the insertion of the defense counsel's name "Mr. Bangs" in general instruction number thirty-six [36], was reversible error by the trial court. In substance the instruction provided that hypothetical questions proposed by defense counsel, Mr. Bangs, relating to the issue of appellant's sanity, were not to be taken for granted as true as to the assumed facts. The effect of the instruction would seem to be beneficial to the appellant and not prejudicial. We find no prejudicial error in the instruction as it was given.

Finally, appellant contends that *Burns Ind. Stat. Ann.*, § 10-3401, which provides as follows, is unconstitutional.

*"Murder—First degree—Penalty.*—Whoever purposely and with premediated malice, or in the perpetration of or attempt to perpetrate a rape, arson, or burglary, kills any human being, is guilty of murder in the first degree, and on conviction shall suffer death or be imprisoned in the state prison during life." [Acts 1941, ch. 148, § 1, p. 447.]

Appellant specifically contends that the "death penalty" provided for in the statute violates Article 1, §§ 16 and 18 of the Constitution of the State of Indiana. First, appellant urges that the death penalty, as prescribed punishment for conviction of first degree murder, is a cruel and unusual punishment, which is proscribed by Article 1, § 16, which provides as follows:

*"Excessive bail, punishment, and penalties.*—Excessive bail shall not be required. Excessive fines shall not be imposed. Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offense."

Second, appellant urges that the death penalty, as prescribed punishment for conviction of first degree murder, is a vindictive justice and violates the principles of reformation and as such is in violation of Article 1, § 18, which provides as follows:

*"Reformation as basis of penal code.*—The penal code shall be founded on the principles of reformation, and not of vindictive justice."

In *In re Kremler* (1889), 136 U. S. 436, 447, 10 S. Ct. 930, 933, 34 L. Ed. 519, 524, the Supreme Court of the United States stated:

"Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word used in the Constitution."

In *Miller* v. *State* (1897), 149 Ind. 607, 617, 618, 49 N. E. 894, 897, this court interpreted the word "cruel" and made the following statement:

"The word, according to modern interpretation, does not affect the legislation providing imprisonment for life or for years, or the death penalty by hanging or electrocution."

Similarly, in *McCutcheon* v. *State* (1927), 199 Ind. 247, 260, 155 N. E. 544, 549, we stated:

"Appellant assigns as another reason why he should be granted a new trial 'that the verdict of the jury inflicts cruel and excessive punishment.' The provisions 14, 15, of Art. 1, § 16, Indiana Constitution, § 68 Burns 1926, that 'cruel and unusual punishment shall not be inflicted' is not violated by a death penalty for murder. See *Hobbs* v. *State* (1893), 133 Ind. 404, 409, 32 N. E. 1019, 18 L.R.A. 774; *Wilkerson* v. *Utah* (1878), 99 U. S. 130, 25 L. Ed. 345. 'It is absurd to suppose that the constitution prohibits' punishment by death for murder, *State* v. *Tomassi* (1908), 75 N. J. Law 739, 747, 69 Atl. 214. The punishment fixed is legal and the Supreme Court could not interfere, if it so desired, on account of the severity of the penalty. *McCulley* v. *State* (1878), 62 Ind. 428; *Murphy* v. *State* (1884), 97 Ind. 579.

"Nor is the punishment of death for murder in the first degree in conflict with Art. 1, § 18 of the Constitution, § 70 Burns 1926—'the penal code shall be founded on principles of reformation, and not vindictive justice.' Such punishment 'is not vindictive but is even-handed justice.' *Driskill* v. *State* (1855), 7 Ind. 338, 343, necessarily meted out for the maintenance of the peace and the protection of the citizens of the state."

The English Parliament and the framers of our Constitution in this country used the language cruel and unusual punishment as a description of some of the punishment inflicted in the days of the early development of our law, such as burning at the stake, crucifixion, breaking on the wheel, draw and quartering, disembowelment alive, torture on the rack and other types of barbaric treatment. This language had a definite meaning and purpose when placed in the Constitution and in our opinion it does not eliminate the death penalty when the legislative body still sees fit to fix the same as a penalty in certain heinous crimes.

We feel the question in our jurisdiction hardly needs to be discussed, since precedent and authority have determined the question against the position taken by the appellant ■ and although a judge may personally not approve the punishment fixed by the legislature for some crimes, it is not the judge's privilege, because he does not agree with the legislative policy, to attempt to nullify legislative enactment. We would be violating our oaths and stepping outside our jurisdictional function to do so.

Likewise appellant's contention that the death penalty as punishment for the crime of first degree murder is a ■ "vindictive justice" is also without merit. In *Driskill* v. *State* (1855), 7 Ind. 338, 343, this court stated:

"The punishment of death for murder in the first degree, is not, in our opinion, vindictive, but is even-handed justice. There is, indeed, nothing vindictive in our penal laws. The main object of all punishment is the protection of society."

For the reasons stated we are bound by legislative policy and historical rationale, therefore, the appellant's contention as to the death penalty must fail.

The judgment of the trial court is affirmed.

Givan, Hunter, JJ., concur; Prentice, J., dissenting; DeBruler, J., concurring and dissenting.

### CONCURRING AND DISSENTING OPINION

DEBRULER, J.—For the reasons set out hereafter in this opinion, I cannot vote to sustain the constitutionality of the death penalty. Death as a form of punishment is forbidden by both the Indiana and the United States Constitutions. The first part of this opinion deals with the claim that Art. 1, § 18 of the Indiana Constitution, requiring as it does that the penal code be based upon principles of reformation, prohibits the death penalty. The second part of this opinion deals with the claim that the death penalty is cruel and unusual and as

such is in violation of Art. 1, § 16 of the Indiana Constitution and the Eighth Amendment to the United States Constitution.

## I.

Appellant claims that the penalty of death for first degree murder is unconstitutional as violative of Art. 1, § 18 of the Constitution of Indiana. This provision of the Indiana Bill of Rights is as follows:

"The penal code shall be founded on the principles of reformation, and not of vindictive justice."

The first degree murder statute provides as follows:

"Whoever purposely and with premeditated malice, or in the perpetration of or attempt to perpetrate a rape, arson, robbery, or burglary, kills any human being, is guilty of murder in the first degree, and on conviction shall suffer death or be imprisoned in the state prison during life." I.C. 1971, 35-13-4-1, being Burns § 10-3401.

Whatever may be the case in other jurisdictions, in Indiana the Constitution explicitly sets out that at least one of the functions of punishment must be to reform the offender and that function is absolutely incompatible with the death penalty.

In spite of the obvious, clear meaning of § 18, this Court has in the past upheld the validity of the death penalty. *Hawkins* v. *State* (1941), 219 Ind. 116, 37 N. E. 2d 79; *Mc-Cutcheon* v. *State* (1927), 199 Ind. 247, 155 N. E. 544; *Rice* v. *State* (1855), 7 Ind. 332; *Driskill* v. *State* (1855), 7 Ind. 338. The rationale of this position was set out in *Driskill* and *Rice,* and subsequent cases have added nothing to the discussion.

In *Driskill,* this Court said:

"In connection with this point, it is insisted that the law authorizing the death penalty is in conflict with section eighteen of the bill of rights, which requires the penal code to be founded on principles of reformation, and not of vindictive justice. *The punishment of death for murder*

*in the first degree, is not, in our opinion, vindictive, but is even-handed justice.* There is, indeed, nothing vindictive in our penal laws. *The main object of all punishment is the protection of society.* With that end in view, the legislature have, in a given case, left it within the discretion of the jury to say when the death penalty shall be inflicted. *It is true, one branch of that discretion does not contemplate reform; still, it is the only instance in the law in which the purpose of reformation is not prominent, and it cannot, it seems to us, be allowed to give character to the principles upon which the entire code is founded.* The eighteenth section of the bill of rights, when properly construed, requires the penal laws to be so framed as to protect society, and at the same time, *as a system, to inculcate the principle of reform.* In this view, the present code is, no doubt, founded on the principles of reformation, within the spirit and intent of the constitution. The law which allows the death penalty to be inflicted, must, therefore, be held valid." (Emphasis added.) 7 Ind. at 342, 343.

In *Rice,* this Court said:

"It is also decided in *Driskill* v. *State, infra,* that the death penalty is not in conflict with the 18th section of the first article of our constitution. If any question can be raised before the judiciary upon the discretion of the legislature under that section, we concur that it has not been abused in leaving the question of assessing that penalty to the jury. *There are cases beyond the hope of reformation—criminals whose necks have become so hardened 'that they should suddenly be cut off, and that without remedy.'* " (Emphasis added.) 7 Ind. at 338.

In the above quotations the Court made several attempts to justify its conclusion that § 18 is no obstacle to the enactment of the death penalty provision by the Legislature. I believe the arguments fail to support that conclusion.

First, the Court stated boldly that the death penalty is not vindictive in nature but is "even-handed justice." This has no determinable meaning. It might mean that the death penalty is an option which the sentencing authority may choose in *all* first degree murder cases. As such it is true but beside the point. It might mean that the death penalty

is not vindictive because it is the taking of the life of the offender who has himself taken a life. This would be the same as claiming that the "eye for an eye" philosophy is not vindictive, when in fact it is the epitome of vindictiveness and revengefulness. The exclusive use of the "eye for an eye" philosophy is precisely what is precluded by § 18. Whatever it might have meant to the judge who wrote it, this statement that the death penalty is even-handed justice is not an argument at all, and does not succeed in establishing that the death penalty is not vindictive.

Second, the Court said that the "main object of all punishment is the protection of society." Although this is not stated in the Constitution and the Court does not indicate any constitutional basis for the claim, I assume it to be one of the basic objectives of the penal system. However, the need to protect society does not require the death penalty, and there is no reason to adopt this objective to the *exclusion* of the principle embodied in § 18. If possible we must try to give effect to *both* objectives of the criminal sanction. This is easily done because there is nothing in § 18 that is incompatible with the objective of protecting society. *Section 18 merely precludes a penalty which forecloses all possibility of reformation of the offender.* Life imprisonment as a maximum penalty accomplishes both goals and there is no need to choose between them; but the death penalty defeats one of them, the only one specifically set out in the Constitution.

Third, the Court said the requirement that the "penal code" be founded on the principles of reformation did not apply to each and every criminal statute, but merely applies to the entire system, and one instance, where admittedly the penalty does not contemplate reform, does not make the whole system vindictive in violation of § 18. I see no reason to interpret § 18 in this way. The "penal code" is made up of each and every legislative enactment which defines a crime and provides a penalty for a violation thereof; it is the class of all criminal statutes and it is they which must be founded on principles

of reformation. The language of § 18 does not indicate any exceptions and the Court offers no valid reason to accept any. The fact recognized by the Court in *Driskill*, that the death penalty "is the only instance in the law in which the purpose of reformation is not prominent" does not support the argument that the death penalty is constitutional, but on the contrary clearly demonstrates that it is a lone anomaly among the penal laws and that it is at odds with the rest of the body of penal laws and that it is unconstitutional.

Fourth, the Court seemed to rely on the fact that the sentencing authority has the discretionary power in a first degree murder case to impose a penalty of life imprisonment rather than death if it so chooses. Presumably they thought that the existence of this power renders the penalty provision non-vindictive and in conformance with principles of reformation, and, therefore, not in violation of § 18. In my view the power of the sentencing authority to select life imprisonment rather than death does not render the penalty provision constitutional under § 18. The question is, when the death penalty is in fact chosen, is § 18 satisfied? Section 18 means that the sentence *actually imposed* must leave open the possibility of reformation of the offender. This is not satisfied by the existence of a *potential* sentence of life imprisonment.

Fifth, in the *Rice* case, the Court states its firm opinion that those offenders who had been assessed the death penalty were beyond any hope of reformation and, therefore, the principles of reformation did not need to be considered in a death case. I believe this position is erroneous for two reasons: (1) The concept of human nature implicit in § 18 is one which says that every man, no matter how depraved, has the possibility of redemption for his evil ways through a change of heart. Who are we to say any man's heart is hardened beyond any hope of change? (2) There are no grounds for believing that those persons who receive the death penalty are in fact beyond hope of reformation since the sentencing authority is not required to find that the defendant is non-reformable

before assessing the death penalty. The Court is merely saying that the imposition of the death penalty is justified because the offender is non-reformable, and we know he is non-reformable because he has received the death penalty.

I would hold that the mandate of § 18 clearly prohibits the death penalty and that no Indiana case has even begun to offer a good counter argument to that position.

## II.

Appellant next claims that the penalty of death is a cruel and unusual punishment and as such in violation of Art. 1, § 16 of the Indiana Constitution and the Eighth Amendment to the United States Constitution. (The Eighth Amendment is now applicable to the states, through the Fourteenth Amendment. *Dembowski* v. *State* (1968), 251 Ind. 250, 240 N.E.2d 815; *Robinson* v. *California* (1962), 370 U.S. 660, 82 S. Ct. 1417, 8 L. Ed. 2d 758.) Those constitutional provisions are as follows:

"Excessive bail shall not be required. Excessive fines shall not be imposed. Cruel and unusual punishment shall not be inflicted. All penalties shall be proportioned to the nature of the offense." Art. 1, § 16, Indiana Constitution.

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Eighth Amendment to the United States Constitution.

### A. *STARE DECISIS*.

There is only one case in Indiana which has dealt directly with this precise constitutional issue, *McCutcheon* v. *State*, *supra*. There this Court said:

"Appellant assigns as another reason why he should be granted a new trial 'that the verdict of the jury inflicts cruel and excessive punishment.' The provision 14, 15. of Art. 1, § 16, Indiana Constitution, § 68 Burns 1926, that 'cruel and unusual punishment shall not be inflicted' is not violated by a death penalty for murder. See *Hobbs* v. *State* (1893), 133 Ind. 404, 409, 32 N. E. 1019, 18 L. R. A. 774; *Wilkerson* v. *Utah* (1878), 99 U.S. 130, 25 L. Ed. 345. 'It is absurd

to suppose that the constitution prohibits' punishment by death for murder, *State* v. *Tomassi* (1908), 75 N. J. Law 739, 747, 69 Atl. 214." 199 Ind. at 260.

The Court disposed of the claim in a summary fashion without offering any reasons for its conclusion and without coming to grips with the problems involved. The Court cited only one Indiana case and it did not involve the death penalty. In *Hobbs, et al.* v. *State* (1892), 133 Ind. 404, 32 N. E. 1019, the Court dealt with the issue whether the statute authorizing imprisonment of two to ten years for "riotous conspiracy" was invalid as providing for cruel and unusual punishment. Therefore, it was pure dicta when the Court stated that the death penalty was not cruel according to modern interpretation. The two non-Indiana cases, *Wilkerson* v. *Utah* (1878), 99 U. S. 130, 25 L. Ed. 345, and *State* v. *Tomassi* (1908), 75 N. J. Law 739, 69 Atl. 214, were not binding authority on this Court in *McCutcheon* and in neither case was the court faced with the exact issue presented here. Those cases involved the issue of whether one specific mode of execution was cruel and unusual punishment and they did not have to agonize over the broader claim that the death penalty by any method was prohibited as a cruel and unusual punishment. The *McCutcheon* case does not therefore in my opinion have such precedential value and weight that would require me to follow it without reconsideration.

In addition, I would point out that the United States Supreme Court has never held that the death penalty per se is not prohibited by the Eighth Amendment. The case of *In re Kemmler* (1889), 136 U.S. 436, 10 S. Ct. 930, 34 L. Ed. 519, relied on by the majority dealt with the same issue as *Wilkerson* v. *Utah, supra,* namely whether a specific mode of execution was prohibited, and not whether death per se was prohibited by the Eighth Amendment.

Lastly, insofar as the highest courts of the other forty-one states with the death penalty may have declared that it does

not constitute cruel and unusual punishment, those decisions are not binding on this Court and have only whatever persuasive weight their reasoning merits. I have found, therefore, that the *McCutcheon* case, is the only case which could possibly serve to bind this Court as *stare decisis*, and as pointed out above, its reasoning is non existent and its supporting authorities are threadbare. It is the absence of a strong and binding precedent in support of the constitutionality of the death penalty that renders appellant's claim reasonable from a legal standpoint, and justifies the serious consideration given it by this Court in this case.

## B. *GENERAL PRINCIPLES.*

In deciding whether the death penalty is prohibited by the Eighth Amendment and Art. 1, § 16 of the Indiana Constitution, certain basic principles need be stated and reaffirmed. These basic propositions are not decisive of the issue before the Court, but serve well to place the judgment we make today into perspective. The first is that these provisions of the State and Federal Bill of Rights constitute a limitation upon all three branches of our State government in treatment of persons being punished. *Cox* v. *State* (1932), 203 Ind. 544, 177 N. E. 898. It is the infliction or the authorization to inflict "cruel and unusual punishment" that is prohibited, no matter what the source in government. It constitutes a limitation on the powers of judges and juries in assessing penalties. In *Cox* v. *State, supra,* this Court said:

> "If it be granted that this court is required by the Constitution to give relief against a cruel and unusual punishment inflicted under a valid and constitutional law (or if it be granted that it would in an unusual case make an exception to the general rule heretofore announced), we would not disturb the judgment in the case at bar. We have heretofore set out briefly the facts of this case as established by the evidence offered (principally by the evidence offered in the appellee's behalf). . . . Under that evidence we could not say that the imprisonment imposed was cruel and unusual for the crime proved." 203 Ind. at 560.

In the above language, the Court revealed that it reviewed the acts of misconduct of the defendant constituting the crime and judged for itself whether the penalty assessed was cruel and unusual in the constitutional sense. This approach was recently re-affirmed by us in *Hobbs* v. *State* (1969), 253 Ind. 195, 252 N. E. 2d 498, quoting from *Dembowski* v. *State, supra:*

> " 'There can be no question that a sentence may be excessive, even though within the maximum of the statute, but if excessive, it is within the power of the appellate court to enforce this provision of the Bill of Rights, and avoid the judgment so far as it is excessive.' " 252 N. E. 2d at 501.

The application of the constitutional limitation to the exercise of the judicial function in assessing a punishment after conviction, is also supported by the cases of *Shustrom* v. *State* (1933), 205 Ind. 287, 185 N. E. 438; *Ralph* v. *Warden,* 438 F. 2d 786 (4th Cir., 1970) ; and *Workman* v. *Commonwealth* (1968), 429 S. W. 2d 374. I am also of the opinion that a court in the exercise of its power to punish for contempt would be limited by this provision of the Constitution.

The cruel and unusual punishment's provision is a limitation upon the exercise of the legislative power within the state and prohibits the Legislature from authorizing sentences which are disproportionate to the harm sought to be prevented by the statute as well as excessively severe punishments. *Shields* v. *State* (1898), 149 Ind. 395, 49 N. E. 351; *Cox* v. *State, supra; Hobbs* v. *State* (1969), *supra; Dembowski* v. *State, supra.*

The Eighth Amendment and Art. 1, § 16 likewise prohibit those who exercise the powers of the executive branch of State government from inflicting cruel and unusual punishments. *Cox* v. *State, supra; Wilwording* v. *Swenson* (C. A. 8, 1971), 9 Cr. L. 2059; *Roberts* v. *Williams* (C. A. 5, 1971), 9 Cr. L. 2052.

Another basic principle here involved is that which assigns to this Court the duty to determine, when the issue is presented, whether a specific act of any of the three branches of government is prohibited by the State or Federal Constitution. *Public Service Commission* v. *Indianapolis* (1956), 235 Ind. 70, 131 N. E. 2d 308; *Thorpe* v. *King* (1967), 248 Ind. 283, 227 N. E. 2d 169. In this case we are concerned with the constitutionality of an enactment of the Legislature and we approach this task with great caution and restraint. This attitude was well expressed in *Weems* v. *U.S.* (1910), 217 U.S. 349, 30 S. Ct. 544, 54 L. Ed. 793, where the United States Supreme Court said:

> "We disclaim the right to assert a judgment against that of the legislature, of the expediency of the laws, or the right to oppose the judicial power to the legislative power to define crimes and fix their punishment, unless that power encounters in its exercise a constitutional prohibition. In such case, not our discretion, but our legal duty, strictly defined and imperative in its direction, is invoked. Then the legislative power is brought to the judgment of a power superior to it for the instant. And for the proper exercise of such power there must be a comprehension of all that the legislature did or could take into account,—that is, a consideration of the mischief and the remedy. However, there is a certain subordination of the judiciary to the legislature. The function of the legislature is primary, its exercise fortified by presumptions of right and legality, and is not to be interfered with lightly, nor by any judicial conception of its wisdom or propriety. They have no limitation, we repeat, but constitutional ones, and what those are the judiciary must judge." 217 U.S. at 378, 379.

With this in mind I now turn to the question of the meaning of the phrase "cruel and unusual punishment."

## C. *MEANING.*

### 1. "Evolving Standards of Decency."

There is a uniformity of opinion about the meaning of "cruel and unusual punishments" in two regards: first, that the words "cruel" and "unusual" are difficult to define and it is

not clear what punishments fall within that class; and, second, that the provision constitutes a prohibition against the infliction of physical pain, mutilation of the human body and tortures of the type which characterized the period of the Spanish Inquisition. These two conclusions are given expression in *Wilkerson* v. *Utah, supra:*

> "Difficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted; but it is safe to affirm that punishments or torture, such as those mentioned by the commentator referred to, and all others in the same line of unnecessary cruelty, are forbidden by that amendment to the Constitution." 99 U.S. at 135, 136.

The commentator mentioned in that quotation was Blackstone, and the specific punishments he described were public dissection, burning alive, emboweling alive, beheading and quartering. Other forms of prohibited punishment of the sort uniformly condemned by the cases interpreting the Eighth Amendment include putting in the pillory, burning at the stake, breaking on the wheel, hanging in chains, castration, mutilation, crucifixion, lingering death, cutting off hands or ears, boiling in oil, use of the thumbscrew or boot and use of the whipping post. *Hobbs* v. *State* (1893), *supra; Weems* v. *U.S., supra.*

While there can be no denial of the proposition that the Eighth Amendment prohibits such punishment, courts have construed the Eighth Amendment to prohibit a broader range of punishments in various circumstances. In the well known case of *Weems* v. *U.S., supra,* the defendant was sentenced to twelve years at hard and painful labor in ankle and wrist chains. This term of imprisonment was to be followed by civil interdiction, perpetual absolute disqualification, and subjection to surveillance for life. The United States Supreme Court held the sentence to be constitutionally cruel and unusual. The most important aspect of this case is that this

sentence does not bear any resemblance to the medieval tortures thought prohibited by the Eighth Amendment up to the time of the case. See *The Death Penalty*, 83 Harv. L. R. 1773, at 1786. The sentence in the case was imprisonment with certain subsequent disabilities added. In describing this sentence, the court concludes:

> "It is cruel in its excess of imprisonment and that which accompanies and follows imprisonment. It is unusual in its character. Its punishments come under the condemnation of the Bill of Rights, both on account of their degree and kind." 217 U.S. at 377.

The latest United States Supreme Court decision concerning the prohibition against "cruel and unusual punishments" was *Trop* v. *Dulles* (1958), 356 U.S. 86, 78 S. Ct. 590, 2 L. Ed. 2d 630. In that case the appellant was denied a passport under a provision of the Nationality Act of 1940, 8 U.S.C. 1481, which said that upon conviction for desertion from the armed forces and dishonorable discharge, the person was to suffer loss of citizenship. The court held that expatriation as a punishment was "cruel and unusual" punishment and as such was prohibited by the Eighth Amendment.

The significance of *Trop, supra,* lies in its basic approach to the problem of giving substance to the phrase "cruel and unusual punishment," which was set out as follows:

> "The Amendment must draw its meaning from the evolving standards of decency that marks the progress of a maturing society." 356 U.S. at 101.

The first thing to note about that basic approach is that this Court in making its decision on appellant's claim that the death penalty is a cruel and unusual punishment need not *limit* itself to declaring only those specific punishments which were known to the framers of the State and Federal Constitutions and which were considered by them to be cruel and unusual, and which were intended by them to be prohibited by the insertion of the Eighth Amendment into the United

States Constitution and Art. 1, § 16 into the State Constitution. No such strict limitation on the judicial function does or should exist. An inquiry into the character of contemporary life in this country at the time of the adoption of our Constitutions, into the usages of particular words and the facts which were at hand at that time are always relevant in determining the proper application of these Constitutions today, but such inquiry can never alone suffice as a basis for disposing of a claim before this Court today. Equally important are intervening judicial interpretations, of the Constitution and the character of contemporary life and knowledge, reflected in them. The *Weems* court disclaimed the existence of any such strict limiting principle when it said:

> "Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital, must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions." 217 U.S. at 373.

The *Weems* case is clearly a holding that the Eighth Amendment does not merely prohibit medieval type physical torture, and clearly extends the Eighth Amendment to prohibit twelve years at hard and painful labor in ankle and wrist chains, both on the grounds of its extreme severity and on the grounds that it was disproportionate to the offense. This Court in the recent cases of *Dembowski* v. *State, supra,* and *Hobbs* v. *State* (1969), *supra,* adopted the more expanded view of the Eighth Amendment expressed in *Weems.*

The *Trop* majority determined that a "standard of decency" existed which condemned expatriation as a punishment for crime as "cruel and unusual punishment." In so doing they relied upon a United Nations survey which showed that only two of eighty-four nations imposed expatration for desertion. Secondly, they considered the harmful effect of expatriation upon an individual human being. I would use this legal approach to determine whether or not there is a "standard of decency" existing in Indiana at this time which would con-

demn the death penalty, per se, as a cruel and unusual punishment and thus prohibited by the Eighth Amendment to the United States Constitution and Art. 1, § 16 of the Indiana Constitution.

a. There are several indicia of a "standard of decency" which would render the death penalty cruel and unusual punishment in this State, which are of greater weight in my judgment than the United Nations survey relied on by the majority in *Trop*.

(1) The number of prisoners executed since 1930 is as follows:

|           | Indiana | Entire United States |
|-----------|---------|----------------------|
| 1930-1939 | 31      | 1667                 |
| 1940-1949 | 7       | 1284                 |
| 1950-1959 | 2       | 717                  |
| 1960      | 0       | 56                   |
| 1961      | 0       | 42                   |
| 1962      | 1       | 47                   |
| 1963      | 0       | 21                   |
| 1964      | 0       | 15                   |
| 1965      | 0       | 7                    |
| 1966      | 0       | 1                    |
| 1967      | 0       | 2                    |
| 1968      | 0       | 0                    |
| 1969      | 0       | 0                    |
| 1970      | 0       | 0                    |
| 1971      | 0       | 0                    |

National Prisoner Statistics, No. 45, August, 1969, Bureau of Prisons. These statistics indicate a dramatic decrease in the number of executions. I believe this has resulted from a growing reluctance on the part of the judiciary and the general community to sanction the execution of prisoners as punishment for criminal conduct. This reluctance has resulted in the *de facto* abolition of the death penalty since 1962 in Indiana, the date of our last execution. In the entire United States there has been a *de facto* abolition of the death penalty since 1967.

(2) It appears that in 1966, approximately 47% of the American public opposed capital punishment for convicted murderers, while 42% favored it and 11% were undecided. In 1960, the comparable figures were 36% opposed, 51% in favor, and 13% undecided. *Witherspoon* v. *Illinois* (1968), 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776.

(3) The jury in Indiana, hears all of the facts in first degree murder cases and upon conviction must choose between life imprisonment or death as the punishment. In making this choice, a jury reflects the broad community feelings regarding the use of the death penalty.

> "a jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death." 391 U.S. at 519.

So it is with the judge when trial by court is held and a conviction results or a plea of guilty is received, and the choice becomes his. At the present time there are 154 men in Indiana prisons committed for first degree murder. Only 7 of those men are under sentence of death. In the period of 1966 to date 58 were committed to Indiana prisons for first degree murder and only three of those are under sentence of death. Therefore, the jury or judge, when faced with the necessity of choosing between life and death for the person convicted of first degree murder, has chosen life 95% of the time since 1966 and 96% of the time considering all men now committed for first degree murder.

(4) The General Assembly of this State in 1965 enacted the following statute:

> "AN ACT to abolish capital punishment and prescribe in lieu thereof imprisonment during life.
> BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF INDIANA:
> "SECTION 1. Hereafter no person shall suffer death upon conviction of any public offense but in instances in which the penalty of death is now prescribed by statute

any person convicted thereunder shall be imprisoned during life, or imprisoned during life without eligibility for parole at any time.

SEC. 2. All laws and parts of laws in conflict with the provisions of this act are hereby repealed.

SEC. 3. Whereas an emergency exists for the immediate taking effect of this act, the same shall be in full force and effect from and after its passage."

The Governor of Indiana vetoed that enactment with the following message:

"Mr. Speaker and Members of the House of Representatives I return herewith, without approval, House Enrolled Act No. 1054. *In my heart, I am opposed to taking the life of another.* But, as Governor, I cannot, in good conscience, take the easy course of signing away this awful penalty unless it is the clear mandate of the people. They must have the opportunity, in an election where this is an issue, to determine whether the penalty, which we have had in our law since statehood, shall no longer be. *Until the issue is decided no man's life should be taken.* I have sought the help of many people in reaching a conclusion, including governors of our state, but the decision is my own." (Emphasis added.)

In spite of the veto and the fact that this statute did not become "law" it commanded the overwhelming support of the elected representatives of the people of Indiana and showed that the death penalty has ceased to have the support of the people. In that session of our General Assembly the State Senate passed the death penalty repealer by a vote of 35 to 4. The House of Representatives passed the death penalty repealer by a vote of 75 to 18. It constitutes a clear expression that the death penalty offends the "standards of decency" held by the people of this State.

(5) Statistics appearing in 39 N. Y. U. L. Rev. 136, 191 (1964), show that approximately one out of every three persons under sentence of death in this century in the United States received executive commutation. The significance of

these statistics is that after the defendant has been tried in a court of law, convicted, and has exhausted all avenues of appellate review including post-conviction remedies, the executive has felt the need to commute one-third of these cases.

(6) There are nine sister states and Puerto Rico and the Virgin Islands which do not provide for the death penalty for any crime. NPS # 45. In addition in Delaware, Massachusettes and North Dakota where the death penalty has been officially retained the last execution was held prior to 1950, in Montana prior to 1945, and in New Hampshire prior to 1940. President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Courts, p. 27.

(7) The National Commission in Reform of Federal Criminal Laws has recommended repeal of the death penalty. National Commission on Reform of Federal Criminal Laws, ch. 36. That commission was composed of federal judges and Congressmen, and was chaired by Edmund Brown, former Governor of California.

(8) There are twenty-three nations of the world which have abolished capital punishment. They are: Argentina, Australia (Queensland), Austria, Brazil, Colombia, Costa Rica, Denmark, Dominican Republic, Ecuador, Federal Republic of Germany, Finland, Greenland, Iceland, Italy, Mexico (25 states out of 29), Norway, Netherlands, Netherlands Antilles, New Zealand, Portugal, Republic of San Marino, Sweden, Switzerland. United Nations pamphlet, Capital Punishment, 1962.

(9) Appellate courts have gone to great lengths to avoid affirming death cases. Judge Jackson in *Stein* v. *New York* (1953), 346 U.S. 156, 73 S. Ct. 1077, 97 L. Ed. 1522, recognized this fact when he stated:

> "When the penalty is death, we, like state court judges, are tempted to strain the evidence and even, in close cases, the law in order to give a doubtfully condemned man another chance." 346 U.S. at 196.

This same judicial attitude is contained in the following statement of Justice Harlan in *Reid* v. *Covert* (1957), 354 U.S. 1, 77 S. Ct. 1222, 1 L. Ed. 2d 1148:

> "So far as capital cases are concerned, I think they stand on quite a different footing than other offenses. In such cases the law is especially sensitive to demands for that procedural fairness which inheres in a civilian trial. . . . I do not concede that whatever process is 'due' an offender faced with a fine or a prison sentence necessarily satisfies the requirements of the Constitution in a capital case." 354 U.S. at 77.

These comments are a recognition of the "gut reaction" of judges to death as a form of punishment and reflect their absorption of an "evolving standard of decency." The reluctance of review tribunals to affirm in a death case is clearly shown in *Boykin* v. *Alabama* (1969), 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274. There the defendant plead guilty to robbery and was sentenced to death by an Alabama court. Defendant appealed alleging that the death penalty was a cruel and unusual punishment under the Eighth Amendment. The Alabama Supreme Court affirmed the conviction. The United States Supreme Court, in order to avoid deciding that issue, reversed the case on the ground that the record of the guilty plea proceedings was faulty, an error which the defendant had not even alleged in his brief. The following cases reflect similar judicial attitudes: *Kallas* v. *State* (1949), 227 Ind. 103, 83 N. E. 2d 769, and cases cited. *State* v. *Laws* (1968), 51 N. J. 494, 242 A. 2d 333; *State* v. *Ramirez* (1921), 34 *Idaho* 623, 203 P. 279, 29 A. L. R. 297; *Davis* v. *State* (1922), 155 Ark. 245, 244 S. W. 750; *Williams* v. *State* (1931), 183 Ark. 870, 39 S. W. 2d 295; *Frady* v. *U.S.* (D. C. Cir.), 121 U.S. App. D. C. 78, 348 F. 2d 84, certiorari denied, 382 U.S. 909, 86 S. Ct. 247, 15 L. Ed. 2d 160 (1965); *Coleman* v. *U.S.* (1965), 123 U.S. App. D. C. 103, 357 F. 2d 563; *Spillers* v. *State* (1968), Nev., 436 P. 2d 18; cf. *Hubka* v. *State* (1928),

40 Okl. Cr. 161, 267 P. 864; *Fritz* v. *State* (1912), 8 Okl. Cr. 342, 128 P. 170; *Commonwealth* v. *Garramone* (1932), 307 Pa. 507, 161 A. 733, 89 A. L. R. 291. See also *Austin* v. *U.S.*, 832 F.2d 129 (D. C. Cir., 1967).

The above factors are but a portion of the indicia available which reflect a growing abhorence of the death penalty and that a "standard of decency" exists in this State, indeed in this country which renders the imposition of the death penalty "cruel and unusual punishment" in violation of the State and Federal Constitutions.

b. The second basic approach used in *Trop* v. *Dulles, supra,* was to focus on the impact of the questioned punishment upon the individual being punished.

> "We believe, as did Chief Judge Clark in the court below, that use of denationalization as a punishment is barred by the Eighth Amendment. There may be involved no physical mistreatment, no primitive torture. There is instead the total destruction of the individual's status in organized society. It is a form of punishment more primitive than torture, for it destroys for the individual the political existence that was centuries in the development. The punishment strips the citizen of his status in the national and international political community. His very existence is at the sufferance of the country in which he happens to find himself. While any one country may accord him some rights, and presumably as long as he remained in this country he would enjoy the limited rights of an alien, no country need do so because he is stateless. Furthermore, his enjoyment of even the limited rights of an alien might be subject to termination at any time by reason of deportation. In short, the expatriate has lost the right to have rights.
> "It subjects the individual to a fate of ever-increasing fear and distress." 356 U.S. at 101, 102.

Justice Brennan concurring described the punishment of expatriation as follows:

> "Expatriation . . . constitutes an especially demoralizing sanction. The uncertainty, and the consequent psychological hurt, which must accompany one who becomes an outcast in his own land must be reckoned a substantial factor in the ultimate judgment." 78 U.S. at 110, 111.

As to the pain and suffering attendant to the meting out of the death penalty, can there be any doubt that the "ever increasing fear and distress" suffered by the man awaiting the moment of execution is as great as that suffered by the expatriate? I would say, no. Is there any doubt that the "psychological hurt" suffered by a condemned man in the period of solitary confinement in the death house, between the time of the verdict and the time of execution, while hope still lingers, be any less than that suffered by an expatriate? I would say not. Is there any doubt that the condemned man does not suffer in the extreme, perhaps only for an instant, as the lethal charge of electricity being forced through the body stops the bodily functions to the point of death? I believe not. The death penalty would have at least as harmful effect on an individual human being as expatriation.

After applying the twin approach taken by the United State Supreme Court in the *Trop* case, I conclude that there is an "evolving standard of decency" in Indiana which standard condemns the death penalty as cruel and unusual punishment in the constitutional sense, as such in violation of the Eighth and Fourteenth Amendments to the United States Constitution, and Art. 1, § 16 of the Indiana Constitution.

2. "Comparative Test."

There is in my judgment a different and equally sound legal reason for declaring the death penalty unconstitutional as well. The original interpretation of "cruel and unusual" was that it applied to those punishments which involved an infliction of extreme physical pain, *e.g.*, cutting off a member of the body or rendering a part of the body non-functional. *Weems* v. *U.S., supra.* It is reasonable to consider this concept of "cruel and unusual punishment" as the first attempt to define and describe a class of punishments which are prohibited by the Constitution. This class of punishments is prohibited and may not be utilized by society *no matter how great the harm done to society by the offender.* The *Weems* case then adds

to the class of prohibited punishments a sentence of fifteen years imprisonment at hard and painful labor in ankle and wrist chains with added disabilities. The *Trop* case added to the class the infliction of extreme psychological anxiety or distress. In my judgment, at this point, a class of punishments has been defined which by necessity must include the death punishment. In any of the punishments which have specifically been held to be per se cruel and unusual punishments, and which are constitutionally impermissible *no matter the harm caused by the offender,* would be chosen by every reasonable person in lieu of the death penalty in the exercise of free choice, such a universal choice, would in my judgment condemn the death penalty as unconstitutional. In my judgment every reasonable person, when faced with the choice, would choose the penalty condemned as unconstitutional in *Weems* and *Trop* instead of death. Every reasonable person would also choose some of the physical tortures rather than death. What is demonstrated by this argument is that some punishments prohibited by the Constitution are in fact deemed less severe and less cruel than the death penalty, and since the death penalty is more severe and more cruel, it too is in violation of that same Constitution. It is simply against reason to affirm on the one hand that society cannot cut off an offender's hand, and that society cannot require a prisoner to wear ankle and wrist chains for fifteen years, and that society cannot expatriate an offender, and to contend on the other that society can strap a man in the electric chair and kill him by a lethal charge of electricity.

### III.

Although I believe that appellant's legal claim that the death penalty is unconstitutional can be disposed of solely upon the foregoing grounds, there is one final point which requires discussion. It is this: From a legal point of view, the death penalty cannot be considered solely as an abstract moral issue involving the justness of taking the life of one

who has taken life. Any consideration of the constitutionality of the death penalty demands a consideration of the legal system of which it is a part. When the executioner performs his function, it is the final step in a long and intricate legal process. An investigation has been made; a charge has been brought; defense attorney has been appointed; a trial has been held; an appeal has been taken. It is common knowledge that there are deficiencies in this legal machinery. The most important of these is lack of money.

I know as a judge of the Indiana Supreme Court, engaged in the review of transcripts of trials and appeal briefs that there are areas in Indiana today where the poor are receiving only perfunctory legal representation because of deficiencies in our system of defending the poor. There are too few public defenders. There are too few trial courts to handle the increasing caseload. Too little money is being provided the indigent defendant for investigation, witness fees, all of which is necessary to providing a decent defense. It is well documented that even when that machinery has done its job completely, miscarriages of justice occur. The innocent do get convicted. Frank & Frank, "Not Guilty"; Borchard, "Convicting the Innocent." The risk of injustice is there, an ineradicable part of the exercise of human judgment. The Indiana case of Nancy Louise Botts serves to document this point. She was convicted of uttering forged checks and received a sentence of two to fourteen years in the Women's Prison. While Nancy Botts was in prison the person who actually had committed the crime confessed and the Governor granted Nancy Botts a full pardon. She spent two years of her life in prison though she was in fact innocent and the victim of a gross miscarriage of justice.

The Franks in their book, "Not Guilty," argue that the miscarriage of justice in the case of Nancy Botts was due in part to her poverty. She did not have funds to employ a handwriting expert who might have proved her innocence. Because of the stress of the trial and incarceration she suf-

fered a miscarriage of her unborn child and in 1939 the Legislature awarded her $4,000.00 for her unjust conviction and confinement.

> "Be it enacted by the General Assembly of the State of Indiana, That for the purpose of compensating the said Nancy Louise Botts for the injury she has sustained by reason of said unjust conviction and confinement for thirteen months in prison, there is hereby appropriated out of any money in the general fund of the state treasury not otherwise appropriated the sum of four thousand dollars, one thousand dollars cash and sixty dollars per month until the balance of three thousand dollars is paid, for the use and benefit of the said Nancy Louise Botts, and the treasurer of the state is hereby authorized to pay said amount to the said Nancy Louise Botts upon a warrant being issued therefor by the auditor of state. The money so appropriated is not made in payment of any claim for damages, but is provided solely out of humanitarian consideration for the wrong done to the said Nancy Louise Botts by citizens of the State of Indiana." Acts 1939, ch. 144.

What form of statute could have been drafted to right the wrong done, had she been wrongfully convicted of murder and executed? The fact that the administration of criminal justice is deficient, and there exists a likelihood that the death penalty may be wrongfully inflicted, seriously militates against the legality of the death penalty.

## IV.

Based on all of the foregoing arguments, I would hold that the provision of the first degree murder statute authorizing the death penalty, is void as in violation of the Eighth and Fourteenth Amendments to the United States Constitution and as in violation of Art. 1, §§ 16 and 18 of the Indiana Constitution and would remand this case to the trial court to expunge the sentence of death and to impose a sentence of life imprisonment.

I concur with the majority opinion wherein it disposes of all other allegations of error against appellant.

DISSENTING OPINION

PRENTICE, J.—I dissent from the majority opinion and join wholeheartedly in the scholarly opinion of Judge DeBruler, which, in my judgment, has all of the weight of legal and social merit. I accept the opinion of the majority as a correct statement of case law upon the constitutional issues, when focused through the lens or stare decisis closed to its most narrow aperture. This Court, however, in recent years has not so limited its spectrum but has accepted the changing needs and demands of society as part of its responsibility. It is to be hoped that it will continue to do so. In view of the considerations so aptly presented by Judge DeBruler, I am compelled to draw our attention to recent pronouncements whereby we courageously struck down certain outmoded and ill considered doctrines that had theretofore chained us to the past by the shackles of repetition, as if the law were a series of tables to be learned and remembered by rote. In so doing, I am primarily concerned with our position with respect to Article I, § 18 of the Constitution of Indiana, in view of *Rice* v. *The State* (1855), 7 Ind. 332, and *Driskill* v. *The State*, (1855), 7 Ind. 338. Repeated, for convenience, Article I, § 18 is as follows:

"The penal code shall be founded on the principles of reformation, and not on vindictive justice."

In 1968 we struck down the doctrine of charitable immunity. (*Harris* v. *Young Women's Christian Association of Terre Haute*, 250 Ind. 491, 237 N. E. 2d 242.) The doctrine was first adopted in America by the Supreme Court of Massachusetts, erroneously thinking it to be the law of England, which in fact had repudiated it ten years earlier. We applied a qualified rule in 1924, (*St. Vincent's Hospital* v. *Stine*, 195 Ind. 350, 114 N. E. 537), followed through in 1963 (*Richardson* v. *St. Mary's Hospital*, 135 Ind. App. 1, 191 N. E. 2d 337), effectively emasculated it in 1964 (*Ball Memorial Hospital* v. *Freeman*, 245 Ind. 71, 196 N. E. 2d 274) and laid it

to rest in 1968, while acknowledging that by stare decisis, charitable immunity was the law of Indiana. Noting in the *Harris* decision that in 1924 at least twenty states granted charitable immunity and only three did not, while in 1968 the great majority of states denied such immunity while only eight or ten, including Indiana, held to the doctrine, we said:

> "We, therefore, believe that the duty of this Court is to repudiate the doctrine of charitable immunity and in view of the fact that it is a Court-made rule, it is hereby abolished by this Court without waiting for the intervention of the Legislative Branch of Government." *Harris* v. *Young Women's Christian Association of Terre Haute, supra,* at 497.

Certainly it was easier to take this action in view of so many of our sister states having previously done so, but it would have been easier yet to have doggedly held to the rule established and followed by our predecessors.

In 1969 (*Troue* v. *Marker,* 253 Ind. 284, 252 N. E. 2d 800), with the intrepidity becoming a court of our statute, we applied the well reasoned dissent of Judge Sharp of our Appellate Court, notwithstanding the legal correctness of the majority opinion based upon strict application of stare decisis. We renounced our prior decisions denying a wife a cause of action for loss of consortium due to the injury of her husband. Calling the reasoning that gave rise to the rule "obviously specious" and declaring that "logic, reason and right are in favor of the position we are now taking. * * *." We there declared:

> "We find that there is no valid or consistent reason offered in the precedents urged by the appellee for a continuation of the doctrine that a wife cannot recover for loss of consortium of her husband. The change taking place in the authorities appears to us to be overwhelming." 252 N. E. 2d at 806.

In 1970 (*O'Connor* v. *O'Connor,* 253 Ind. 295, 253 N. E. 2d 250), we reconsidered our prior position upon the well estab-

lished principle of domestic relations law, the doctrine of recrimination, "* * * In order to determine whether this Court can any longer sanction the use of that rule of law. . . ." 253 N. E. 2d at 255. The doctrine of recrimination dates back, in this state, at least to 1833. (*Christianberry* v. *Christianberry,* 3 Blackford 202.) Our opinion in *O'Connor* v. *O'Connor, supra,* is replete with citations espousing the doctrine as an absolute bar to divorce. Following a thorough analysis of the historical development, application and misapplication of the doctrine, we summed it up with a quote from Charles Dickens' Oliver Twist: " 'If the law supposes that' said Mr. Bumble, 'the law is a ass, a idiot.' " 253 N. E. 2d at 258. We wrote critically of a court that denied the divorce on the grounds of *public morality as embodied in legal precedent,* notwithstanding that the interests of the parties and society obviously would have been better served by awarding the decree; and we concluded by saying "* * * it would thus appear to this Court that the application of recrimination as an absolute bar to divorce is no longer defensible. * * *." 253 N. E. 2d at 259. What, then, should we say of *public immorality embodied in legal precedent?*

Thusly have we, at the risk of momentary instability in our system, investigated the wisdom of precedents established many years ago and been constrained to look forward rather than backward. On those occasions, we exercised the authority that is clearly ours and fulfilled the responsibilities that we cannot deny. Our position in the case before us is the same. Whatever may have been the circumstances in 1855 motivating us to the decisions reached in *Rice* v. *State, supra* and *Driskill* v. *State, supra,* it is clear that we should not be governed by such mish-mash. In *Rice* v. *State, supra,* we said: "* * * There are cases beyond the hope of reformation—criminals whose necks have become so hardened 'that they should suddenly be cut off, and that without remedy.' " 7 Ind. at 338. In other words, there are those that cannot be reformed. This may be true, but the framers of our constitution did not

concede the point, hence the proscription "* * * The penal code shall be founded on the principles of reformation, * * *." The remedy when we doubt the wisdom of the constitution is by way of amendment, not by blatant denial of its authority. In *Driskill* v. *State, supra,* we said: "* * * The punishment of death, for murder in the first degree is not, in our opinion, vindictive, but is even handed justice. * * *." 7 Ind. at 343. There are many things in law that are so because we say they are so, but there are limits. Death, as punishment for a crime, any crime, cannot be other than vindictive, whatever may be the meaning of "even handed justice." There can be no basis for denying that the death penalty offends against Article I, § 18, except by reliance upon these cases as precedent, and they are, as was said in the *Harris* case, *supra,* built on a foundation that did not exist. The doctrine of stare decisis itself compels us to abandon it when it does not serve the objectives of sense and justice.

From the disclosures of Judge DeBruler's opinion, it is clear to me that we have abandoned capital punishment in this state. All that remains to be done is to abolish it; and it is ludicrous and inhumane to any longer suspend those under sentence of death in a state of limbo, pending formal abolition. We should consider the realities of procuring legislative enactments. Few are directly affected by the question before us. Who is to sponsor their bill, guide it through the committees, and champion it on the floor? We are the guardians of the rights of the most lowly among us, and for us to require them to await the miracle of legislative action in their behalf is an unwarranted passing of our responsibility to the Governor's office or to higher judicial authority and is a denial of constitutional rights. Whether it is a greater cruelty to entinguish a man's life than to lock him in a cage and submit him to unspeakable indignities and torment is a question upon which reasonable minds might well differ. None, however, will deny that the former has a certain finality about it not encompassed in the latter. I believe that it is

because of this finality and the fallibility of man that § 18 was incorporated as a part of Article I of our state constitution; and until we are more learned in the principles of resurrection or at least reincarnation, I cannot accept a sentence of death as consistent with principles of reformation.

NOTE.—Reported in 271 N. E. 2d 425.